Revised October 30, 1998

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 97-40580

Summary Calendar

_____

IN THE MATTER OF STEPHEN J KOSADNAR; PEGGY MARLEA KOSADNAR,

DEBTORS,

STEPHEN J KOSADNAR; PEGGY MARLEA KOSADNAR,

Appellants,

v.

METROPOLITAN LIFE INSURANCE COMPANY,

Appellee.

_____

Appeal from the United States District Court
for the Southern District of Texas
_____

October 23, 1998

Before KING, BARKSDALE, and STEWART, Circuit Judges.

PER CURIAM:

Stephen J. Kosadnar and Peggy Marlea Kosadnar sought to hold Metropolitan Life Insurance Company in contempt of court for violating the automatic stay relating to their Chapter 7 bankruptcy. The bankruptcy court denied the contempt motion, and

the district court affirmed the bankruptcy court's decision. For the following reasons, we affirm the order of the district court affirming the bankruptcy court's order denying the contempt motion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This litigation concerns the terms of employment between Stephen J. Kosadnar (Kosadnar) and Metropolitan Life Insurance Company (MetLife). When first hired in November 1992 as an account representative, Kosadnar became bound and covered by MetLife's Compensation Plan, including the Experienced Representative Plan (EXP).[1] The EXP detailed Kosadnar's salary for the first fifteen weeks of work at MetLife. Kosadnar was paid eight hundred dollars a week; one hundred dollars each week was an interim payment, while the other seven hundred dollars a week was considered an advance against first-year commissions. The advance payments, including interest, were to be repaid to MetLife out of Kosadnar's Expense Reimbursement Account (ERA), beginning in Kosadnar's sixteenth week of employment.

Consistent with the EXP, MetLife began withholding part of Kosadnar's ERA in order to recover the amount of commission advances made to him. In September 1994, Mr. Kosadnar became a sales manager, and a few months later, he returned voluntarily to

---

[1] This statement and all other factual statements in this section were stipulated to by the parties in the original bankruptcy proceeding.

his former job as an account representative.  These employment changes, coupled with MetLife discontinuing the ERA program, necessitated an alteration in the advance-repayment schedule.  In January 1995, to accommodate these changes, the remaining $7903.75 to be repaid to MetLife was spread out over two years, and MetLife began withholding $75.99 per week from Kosadnar's pay.

Under the Compensation Plan, when an account representative sells an insurance policy, MetLife provisionally credits the annualized first-year commission for that policy to a Moving Average Account (MAA), from which the representative's commission payments are made.[2]  If a policy lapses during its first year, the account representative must repay part of the first-year commission for that policy.  Under the Compensation Plan, MetLife has the right to withdraw the entire amount of the commission overpayment from the MAA, which would therefore decrease the amount of commission payments made to the representative.

One of the policies that Kosadnar sold in January 1994 lapsed, resulting in an obligation to repay to MetLife $5023.26 in unearned commissions.  On January 25, 1995, Mr. Kosadnar made a formal request that MetLife allow him to spread out this payment over one year, rather than repaying the entire amount at once from his MAA.  MetLife granted this request and began to

_____

[2] Under the Compensation Plan, account representatives receive ten percent of the balance of the MAA each week.

debit $97.00 from Kosadnar's weekly pay to recover the unearned commission.  In total, MetLife was withdrawing $172.99 per week from Kosadnar's weekly pay.

On June 8, 1995, Kosadnar and his wife, Peggy Marlea Kosadnar, filed a petition for Chapter 7 bankruptcy in the United States Bankruptcy Court for the Southern District of Texas. MetLife continued to withdraw $172.99 from Kosadnar's paycheck. Appellants filed a motion to hold MetLife in contempt of court for violation of the automatic stay.  On January 30, 1996, the bankruptcy court denied appellants' motion, holding that MetLife's actions constituted recoupment and were therefore not subject to the automatic stay.  The district court affirmed the decision of the bankruptcy court, and the appellants timely filed an appeal to this Court.

## II.  DISCUSSION

The disposition of this case depends on whether MetLife's withholdings from Kosadnar's pay are characterized as recoupment or setoff.  The bankruptcy and district courts termed the withholdings as recoupment and therefore held that the withholdings did not violate the automatic stay imposed by the bankruptcy court.  We review these lower court conclusions of law de novo.  See Phoenix Exploration, Inc. v. Yaquinto (In re Murexco Petroleum, Inc.), 15 F.3d 60, 62 (5th Cir. 1994); Killebrew v. Brewer (In re Killebrew), 888 F.2d 1516, 1518 (5th Cir. 1989).

4

Recoupment "'allows a defendant to reduce the amount of a plaintiff's claim by asserting a claim against the plaintiff which arose out of the same transaction to arrive at a just and proper liability on the plaintiff's claim.'" United States Abatement Corp. v. Mobil Exploration & Producing U.S., Inc. (In re United States Abatement Corp.), 79 F.3d 393, 398 (5th Cir. 1996) (quoting Holford v. Powers (In re Holford), 896 F.2d 176, 178 (5th Cir. 1990) (internal quotations omitted)). There are two general requirements to characterizing a withholding as recoupment--first, some type of overpayment must have been made, and second, both the creditor's claim and the amount owed to the debtor must arise from a single contract or transaction.[3] See Photo Mechanical Servs., Inc. v. E.I. DuPont De Nemours & Co. (In re Photo Mechanical Servs., Inc.), 179 B.R. 604, 613 (Bankr. D. Minn. 1995). When applied, the doctrine allows a bankrupt's unsecured creditors to obtain preferential treatment. See id. Specifically, money recouped by creditors from an amount owed to a debtor post-petition would not be subject to the automatic stay. See Holford, 896 F.2d at 179.

A setoff, on the other hand, "involves a claim of the defendant against the plaintiff which arises out of a transaction

---

[3] Appellants claim, without authority, that in addition to these two requirements, the creditor must possess a contractual lien to secure future payments. We have rejected the proposition that the creditor must have any contractual rights to future payments in order to recoup overpayments. See Holford, 896 F.2d at 178.

which is different from that on which the plaintiff's claim is based." Holford, 896 F.2d at 178 (citation and quotation omitted). The Bankruptcy Code specifically disallows the setoff of pre-petition claims against post-petition earnings. See 11 U.S.C. § 553.

This court must determine whether MetLife's recovery of overpayments made to Kosadnar constitutes setoff or recoupment. The key issues, therefore, are whether MetLife withheld money that it overpaid to Kosadnar, and whether the pre-petition overpayments and the post-petition pay arise from the same transaction. We find that because MetLife withheld overpayments arising from the same transaction as Kosadnar's pay, the recovery constitutes recoupment.

First, both the advances against future commissions and the lapsed-policy commissions represent overpayments by MetLife to Kosadnar. MetLife advanced Kosadnar money during his first fifteen weeks of employment, and these payments were expressly termed "advances against first-year commissions" in Kosadnar's employment agreement. Similarly, MetLife overpaid Kosadnar for the lapsed insurance policy, as MetLife credited an entire year's commission into Kosadnar's commission account when, in fact, the policy was not paid for a year. These overpayments are exactly the type of overpayments the recoupment doctrine contemplates. "The majority view is that when an insurance company advances commissions to an insurance agent and that agent later files a

6

petition in bankruptcy, the insurance company may recoup those monies previously advanced as they accrue, post-petition, to the agent." Pruett v. American Income Life Ins. Co. (In re Pruett), 220 B.R. 625, 628 (Bankr. E.D. Ark. 1997) (citing Wineburg v. Knights of Columbus (In re Sherman), 627 F.2d 594, 595 (2d Cir. 1980); In re Ruiz, 146 B.R. 877, 881 (Bankr. S.D. Fla. 1992); Williams v. Tomer (In re Tomer), 128 B.R. 746, 759 (Bankr. S.D. Ill. 1991), aff'd 147 B.R. 461 (S.D. Ill. 1992)); see also Wiley v. Public Investors Life Ins. Co., 498 F.2d 101, 104 (5th Cir. 1974) (allowing insurance company to recoup advances made in anticipation of future commissions); Mutual Trust Life Ins. Co. v. Wemyss, 309 F. Supp. 1221, 1231 (D. Me. 1970) (same). In each of these cases, the insurance company advanced its employee-debtor commissions to which the debtor was not entitled, and the court found that the insurance company overpaid within the meaning of the recoupment doctrine. We therefore have little difficulty finding that MetLife in this case overpaid Kosadnar by advancing him money based on future commissions and by assuming that sold policies would not lapse.

The central question in this case then becomes whether these pre-petition advances arise out of the same transaction as Kosadnar's post-petition pay. Appellants claim that because the advance repayments in this case arose from separate agreements entered into after the original EXP agreement, the pre-petition debts and post-petition claims do not arise out of the same

7

transaction. Appellants argue that there are three separate transactions in this case--first, the EXP agreement; second, the lapsed-policy agreement; and third, the alteration of the advance-repayment schedule.

There is no general standard governing whether events are part of the same or different transactions. "[G]iven the equitable nature of the [recoupment] doctrine, courts have refrained from precisely defining the same-transaction standard, focusing instead on the facts and the equities of each case." United States ex rel. United States Postal Serv. v. Dewey Freight Sys. Inc., 31 F.3d 620, 623 (8th Cir. 1994); see also Official Comm. of Unsecured Creditors of Baja Boats, Inc. v. ITT Commercial Fin. Corp. (In re Baja Boats, Inc.), No. 94-60141, 1996 WL 521416, at *3 (Bankr. N.D. Ohio July 24, 1996) ("Whether the obligations arose from the same transaction is to be determined by the facts and equities of the particular case.").

In this case, we agree with the lower courts that the overall Compensation Plan was one transaction which encompassed both MetLife's claims against Kosadnar based on the pre-petition advances and Kosadnar's claims against MetLife for compensation. First, a plain reading of the Compensation Plan itself indicates that all of its components should be considered part of the same transaction. The parties explicitly agreed in the stipulated facts that "Kosadnar became bound and covered by . . . EXP, which is a part of MetLife's overall compensation plan." The EXP did

8

not contain all material terms of the employment relationship between the parties. Indeed, the EXP itself is labeled as Schedule 7, a part of the overall Compensation Plan.

The Compensation Plan as a whole does contain all material terms relating to the employment relationship and explicitly governs all pre-petition and post-petition claims between the parties. EXP paragraph 4 described the terms relevant to Kosadnar's obligation to repay the commission advance he received during his first fifteen weeks of employment. Schedule 2 of the Compensation Plan detailed how much commission an account representative had to repay to MetLife if a sold policy lapsed. The General Provisions Section 301(H) of the Compensation Plan outlined how an account representative could spread the repayment of unearned commissions over a term of weeks. Lastly, the Compensation Plan explained how the commissions that account representatives earned for selling policies were calculated. Therefore, all original terms governing both types of pre-petition debt at issue here and Kosadnar's post-petition income were present in MetLife's Compensation Plan, which bound both Kosadnar and MetLife.

The fact that changed circumstances necessitated changing the payback schedule for the commission advance does not alter this analysis. "[A]pplication of the 'equitable doctrine [of recoupment] should not depend on whether the parties expressly anticipated the problem.'" Holford, 896 F.2d at 178 (quoting

9

Ashland Petroleum Co. v. Appel (In re B & L Oil Co.), 782 F.2d 155, 159 (10th Cir. 1986) (brackets in original)). The original employment terms between MetLife and Kosadnar clearly contemplated the payback of the commission advances to MetLife. The later alteration to the terms does not change the fact that the debt to MetLife arose out of the original employment contract.

Similarly, the fact that the lapsed policy arose after Kosadnar and MetLife entered into the original employment contract does not mean that the repayment of the lapsed policy commissions constitutes a different transaction. The Compensation Plan clearly provided that account representatives could spread repayments resulting from rescinded policies. As above, the fact that the parties did not anticipate the exact amount of any eventual lapse does not prevent the lapse from arising out of the employment contract.[4]

Therefore, the Compensation Plan encompasses all relevant claims by MetLife and Kosadnar, despite later alterations to repayment terms. When all claims arise out of one contract between the parties, application of the recoupment doctrine is appropriate. See Aetna Life Ins. Co. v. Bram (In re Bram), 179

---

[4] Of course, this type of uncertainty is exactly why such repayment terms are included in the Compensation Plan. If the amount of unearned commissions due to lapsed policies could be accurately forecasted, there would never be a need to repay any unearned commissions to MetLife.

B.R. 824, 826 (Bankr. E.D. Tex. 1995) (stating that "the recoupment doctrine has been applied primarily where the creditor's claim against the debtor and the debtor's claim against the creditor arise out of the same contract"); Long Term Disability Plan of Hoffman-La Roche v. Hiler (In re Hiler), 99 B.R. 238, 242 (Bankr. D. N.J. 1989) (finding that "all the claims arise out of the same contract and that the [creditor] clearly has a valid right of recoupment against the debtor").

In addition, the facts and equities of this case support a conclusion that the pre-petition debts and post-petition pay arose from the same transaction. Each post-petition paycheck received by Kosadnar is, at least in part, paid from Kosadnar's MAA. The balance of this commission account would be substantially smaller if Kosadnar had not altered the repayment schedule for the commission advances and requested a spread of the unearned commission payback for the lapsed policy. In this context, Kosadnar's efforts to avoid repayments are simply attempts to avoid the unfavorable aspects of his employment bargain with MetLife.

We agree with the bankruptcy court that the analysis of Aetna Life Insurance Co. v. Bram (In re Bram), 179 B.R. 824 (Bankr. E.D. Tex. 1995), applies here. In Bram, a debtor was eligible to receive funds from an employee benefit plan, and the amount received from the plan was to be decreased by any amount he received from social security. See id. at 825. The debtor

11

continued to collect the full amount of his eligible benefits from the plan, even after he began to receive payments from social security, resulting in an overpayment of benefits to the debtor. See id. at 825-26. The bankruptcy court allowed a post-petition recoupment of these overpayments, stating that "a debtor may not assume the favorable aspects of a contract (post-petition payments) and reject the unfavorable aspects of the same contract (the obligation to repay pre-petition overpayments by means of recoupment)." Id. at 826.

In this case, Kosadnar is attempting to receive the part of the deal most beneficial to him (the payment from the commission balance), while avoiding the aspects of the employment contract least desirable to him (the payback of the overpayments). As we agree with the bankruptcy and district courts that repayment of the unearned and advanced commissions arise out of the same commission pool and employment contract as the commissions earned by Kosadnar for which he is paid, we find that the withholdings by MetLife constitute recoupment.

Post-petition recoupment does not violate the automatic stay imposed by the bankruptcy court. See Holford, 896 F.2d at 179. "The trustee of a bankruptcy estate 'takes the property subject to rights of recoupment.' . . . '[T]he debtor has no interest in the funds and, therefore, the stay has not been violated.'" Id. (quoting Brock v. Career Consultants, Inc. (In re Career Consultants, Inc.), 84 B.R. 419, 424, 426 (Bankr. E.D. Va.

12

1988)).  Therefore, the bankruptcy court and district court were correct in declining to hold MetLife in contempt of court for violating the automatic stay.

### III.  CONCLUSION

For the foregoing reasons, we AFFIRM the order of the district court affirming the bankruptcy court's order denying the contempt motion.