In re TRI COUNTY HOME HEALTH SERVICES, INC., Debtor.

Tri County Home Health Services, Inc., Plaintiff,

v.

United States Department of Health and Human Services, Defendant.

Bankruptcy No. 99–10365.
Adversary No. 99–5037.

United States Bankruptcy Court,
W.D. Tennessee,
Eastern Division.

Feb. 19, 1999.

Samuel K. Crocker, Nashville, TN, for Debtor/Plaintiff.

Jimmy Croom, Assistant U.S. Attorney, Jackson, TN, for Defendant.

Greg Bongiovanni, Assistant Regional Counsel, Office of the General Counsel, Atlanta, GA, for Defendant.

## MEMORANDUM OPINION AND ORDER RE APPLICATION FOR PRELIMINARY INJUNCTION

G. HARVEY BOSWELL, Bankruptcy Judge.

The Plaintiff in this matter, Tri County Home Health Services, Inc. ("Tri County"),

has filed an application for a preliminary injunction against the United States Department of Health and Human Services ("HHS"). At issue are Medicare reimbursements which are currently being withheld by HHS under the authority of the Medicare statute at 42 U.S.C. § 1395 *et seq.*, and toward the recoupment of Medicare overpayments previously made to the Plaintiff.

The Court conducted a hearing on Tri County's application on February 12, 1999, pursuant to FED. R. BANKR. P. 9014. After reviewing the testimony from the hearing and the record as a whole, the Court makes the following findings of facts and conclusions of law. FED. R. BANKR. P. 7052.

## I. FINDINGS OF FACT

### A. The Nature of Medicare Reimbursement: Statutory and Regulatory Authority

#### 1. The Medicare Provider Agreement

The Medicare program, established under Title XVIII of the Social Security Act (commonly known as the Medicare Act, and codified at 42 U.S.C. § 1395 *et seq.*), is a social insurance program which pays for covered medical items and services provided to eligible aged and disabled persons. HHS enters into contracts, known as provider agreements, with health care entities which will treat Medicare beneficiaries in return for Medicare reimbursement. 42 U.S.C. § 1395cc(e)(2); *Heckler v. Community Health Serv. of Crawford County, Inc.*, 467 U.S. 51, 54–55, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984), *reh'g denied*, 475 U.S. 1061, 106 S.Ct. 1289, 89 L.Ed.2d 596 (1986). Under a Medicare provider agreement, a health care entity agrees to charge Medicare beneficiaries only the statutorily mandated deductible and coinsurance amounts and otherwise to take its payment solely from the Medicare program. 42 U.S.C. § 1395cc(a). HHS may not reimburse an agency for services unless the agen-

cy is operating under a valid provider agreement. 42 U.S.C. § 1395f(a).

#### 2. Medicare Reimbursement is Cost-Based

By statute, a provider is reimbursed for the actual "reasonable cost" of providing services to Medicare beneficiaries. "Reasonable cost" is determined in accordance with cost accounting regulations establishing the methods to be used and the times to be included. 42 U.S.C. § 1395x(v)(1)(A). Medicare reimbursement does not provide for the making of a profit. The principal reimbursement regulations appear at 42 C.F.R. § 413 *et seq.*

Reimbursement to providers for services rendered to Medicare beneficiaries is made by private organizations, such as Palmetto Government Benefits Administrators, Inc., ("Palmetto"). These organization act as fiscal intermediaries under contract with HHS. 42 U.S.C. § 1395h. The payment function requires ascertaining the "reasonable cost" of services rendered to beneficiaries. This payment process is a multi-faceted system. Interim payments are made to providers not less than monthly, with subsequent adjustments made for overpayments and underpayments, based on reviews of annual cost reports submitted by the provider and of additional information submitted throughout the year. 42 U.S.C. §§ 1395g(a), 1395x(v)(1)(A)(ii), 42 C.F.R. §§ 413.5(b)(1), (2), 413.64. "The intent is that the interim payments shall approximate actual costs [of providing Medicare services] as nearly as possible . . . ." 42 C.F.R. § 413.64(b).

Interim payments are only estimates of what is actually due the provider. An intermediary may adjust the interim rate of payment if it has evidence that a provider's actual costs fall significantly below the computed rate. 42 C.F.R. § 413.64(e). The primary source of such evidence is the cost report information which the provider must file at periodic intervals.[1]

---

1. A provider has a right to file an administrative appeal of an intermediary's reimbursement determination only upon the intermediary's eventual issuance of a notice of program reimbursement, which occurs upon the final settlement of a provider's annual cost report. 42 U.S.C. § 1395oo; 42 C.F.R. § 405.1803. Only after an

exhaustion of administrative remedies may a court review a reimbursement determination of the Medicare program. 42 U.S.C. § 1395oo(f).

There is a firm jurisdictional bar against any court adjudicating any Medicare reimbursement dispute expect as provided in the Medicare stat-

Certain providers may be paid by a special reimbursement methodology known as periodic interim payments or "PIP." On PIP, a provider receives a standardized amount in Medicare reimbursement once every two weeks (based upon estimates of the provider's cost in providing services at its current volume of activity). PIP is an alternative to "the regular methods of interim payment on individual provider billings for ... services," 42 C.F.R. § 413.64(h)(1), and it may only be implemented, and may only remain in effect, when the provider satisfies certain criteria. *See generally*, § 413.64(h)(2), (3). Providers often favor reimbursement by the PIP methodology because of the regularity and predictability it means for their cash flow. However, the regulations recognize that PIP payments can result in an "undue risk of ... an overpayment" in various circumstances. § 413.64(h).

### 3. "Necessary Adjustments" for Overpayments

As designed by Congress, the Medicare reimbursement method is one of interim payments (based on estimates of a provider's costs) subject to subsequent adjustments. As is apparent, a subsequent review can reveal that the interim payments have exceeded the provider's actual costs, and hence, that the provider has been overpaid.

The Medicare statute at 42 U.S.C. § 1395g(a) expressly directs HHS to make "necessary adjustments on account of previously made overpayments." Under this statutory mandate, the HHS "shall periodically determine" what a provider "should" be paid and accordingly make the "necessary adjustments" to reconcile this determination with what the provider was "previously" paid. 42 U.S.C. § 1395g(a). Thus, it may accurately be stated that a provider's proper "payment" is the amount disbursed by the Medicare program (in the form of interim payments)

minus adjustments for any previous overpayments (or plus adjustments for previous underpayments).

### 4. Recent Legislative Changes in the Reimbursement of Home Health Providers

Concerned with the extraordinary growth in Medicare spending for home health services, Congress created a new statutory payment method for home health providers in the Balanced Budget Act of 1997 ("the BBA"), Public Law 105–33, at §§ 4604 *et seq.* (amending 42 U.S.C. § 1395x(v)(1)(L)). *See also*, 63 Fed.Reg. 15718 ff. (March 31, 1998). For fiscal years commencing October 1, 1997, or thereafter, a home health provider is reimbursed the *lowest* of (i) the provider's actual reasonable allowable costs, (ii) a per-visit limitation in the aggregate, or (iii) a per-beneficiary limitation on the aggregate. *Id.* In brief, the effect of this law is to place a cap on what the home health provider can be paid. These new statutory criteria have resulted in significant changes to the payment of some home health providers. However, the BBA did not alter the basic premises set forth above: that the home health provider's reimbursement is based on costs; that its payments will be based on estimates, subject to retrospective adjustments; and that Medicare overpayments can occur.

### B. Statement of Facts

The relevant facts in this case are straightforward and undisputed. The Plaintiff operates a home health agency which participates in the Medicare program, pursuant to a provider agreement. The Plaintiff is reimbursed for services rendered to Medicare beneficiaries. The Plaintiff is reimbursed in the form of PIP payments. Palmetto is the Medicare fiscal intermediary which, under contract with HHS, administers the claims processing, reimbursement, auditing, and

ute. 42 U.S.C. § 1395ii (incorporating 42 U.S.C. § 405(h)). *See, e.g., Heckler v. Ringer*, 466 U.S. 602, 622–624, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984); *American Academy of Dermatology v. Dep't. of Health and Human Serv.*, 118 F.3d 1495 (11th Cir.1997). There is no jurisdictional basis by which, or upon which, that bar may be circumvented or evaded. *Bodimetric Health Serv.,*

*Inc. v. Aetna Life & Cas.*, 903 F.2d 480, 488–489 (7th cir.1990), *cert. denied*, 498 U.S. 1012, 111 S.Ct. 579, 112 L.Ed.2d 584 (1990); *In re Home Comp Care, Inc.*, 221 B.R. 202, 205 (N.D.Ill. 1998); *In re AHN Homecare, L.L.C.*, 222 B.R. 804, 807–808 (Bankr.N.D.Tex.1998); *In re St. Johns Home Health Agency, Inc.*, 173 B.R. 238, 244 (Bankr.S.D.Fla.1994).

other related functions with regard to this Plaintiff.

On or about December 14, 1998, upon a review of the Plaintiff's payment rates in light of information submitted by the Plaintiff, Palmetto determined that the Plaintiff had been overpaid in the amount of $2,000,-417 for the fiscal year which ends ("FYE") June 30, 1999. Palmetto notified the Plaintiff of this determination in writing. Also, the data submitted by the Plaintiff on its annual Medicare cost report for FYE June 30, 1998, showed a Medicare overpayment of some $221,824.00 in that fiscal year.

The Plaintiff filed its bankruptcy petition on January 14, 1999. Palmetto, as Medicare fiscal intermediary and as agent for HHS, has been withholding the Plaintiff's Medicare reimbursement since that date, as an adjustment for previously-made and determined Medicare overpayments made to the Plaintiff.

## II. CONCLUSIONS OF LAW

■ It is the burden of the party seeking a preliminary injunction to show that it is entitled to one, not the burden of the other party to show that the movant is not entitled. *Granny Goose Foods, Inc. v. Bhd. of Teamsters,* 415 U.S. 423, 443, 94 S.Ct. 1113, 39 L.Ed.2d 435 (1974); *North Am. Coal Corp. v. Local Union 2262, UMW,* 497 F.2d 459, 465 (6th Cir.1974). For the reasons set forth *infra* the Plaintiff cannot establish that a preliminary injunction is in order in this case. Therefore, the Plaintiff's application is denied.

■ An injunction is an extraordinary remedy. *Charter Township of Huron v. Richards,* 997 F.2d 1168, 1175 (6th Cir.1993); *Stenberg v. Cheker Oil Co.,* 573 F.2d 921, 925 (6th Cir.1978). Before granting such an extraordinary remedy, a court should pay particular regard for the public consequences in employing it. *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982); *Railroad Comm'n v. Pullman Co.,* 312 U.S. 496, 500, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

■ The four elements to be considered when a movant seeks a preliminary injunc-

tion are (1) whether the movant has shown a strong or substantial likelihood or probability of success on the merits; (2) whether the movant has shown that an irreparable injury will occur absent an injunction; (3) whether the preliminary injunction would harm others; and (4) whether the public interest would be served by the issuance of a preliminary injunction. *Frisch's Restaurant, Inc. v. Shoney's, Inc.,* 759 F.2d 1261, 1263 (6th Cir. 1985). The four considerations are factors to be balanced or weighed. They are to guide the discretion of the court. *Sandison v. Michigan High School Athletic Ass'n,* 64 F.3d 1026, 1030 (6th Cir.1995). A movant's initial burden is to demonstrate its entitlement to preliminary injunctive relief by showing a strong likelihood of success on the merits. *NAACP v. City of Mansfield,* 866 F.2d 162, 167 (6th Cir.1989). The court must then balance the apparent strength of the movant's showing on this initial point against the irreparable harm the movant would suffer in the absence of injunctive relief, the harm which would be caused to others by the issuance of a preliminary injunction, and whether the public interest would be served by an injunction. *Id.*

The Plaintiff's contention is that HHS' withholding of the Plaintiff's Medicare reimbursement is improper; however, HHS contends that its withholding should be recognized as recoupment. The Court agrees with HHS and finds the withholding to be in the nature of an equitable recoupment.

■ Recoupment is "the setting off against asserted liabilities of a counterclaim arising out of the same transaction." *Reiter v. Cooper,* 507 U.S. 258, 264, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993). Recoupment involves no element of preference. *Id.* at 265 n. 2, 113 S.Ct. 1213. The automatic stay in bankruptcy is inapplicable to recoupment because the funds subject to recoupment are not the debtor's property. *In re Malinowski,* 156 F.3d 131, 133 (2nd Cir.1998); *In re Kosadnar,* 157 F.3d 1011, 1016 (5th Cir.1998).

■ There are two general requirements to characterizing a withholding as recoupment. First, some type of overpayment must have been made. *Kosadnar,* 157 F.3d

at 1014. Second, both the creditors' claim and the amount owed to the debtor must arise from a single contract or transaction. *Id.* Recoupment is generally allowed in cases involving a single contract which called for advance payments based on estimates, subject to correction at a later time. *Baker v. United States,* 100 B.R. 80, 84 (M.D.Fla. 1989). Indeed, this is precisely the nature and character of Medicare reimbursement to health care providers. *See,* 42 U.S.C. § 1395g(a).

HHS' actions comport with a substantial body of legal authority which finds that Medicare withholding constitutes recoupment and is, therefore, exempt from the operation of the automatic stay in bankruptcy. *E.g., United States v. Consumer Health Serv. of Am., Inc.,* 108 F.3d 390 (D.C.Cir.1997); *Sims v. U.S. Dep't. of Health & Human Serv. (In re TLC Hosp. Inc.),* 225 B.R. 709 (N.D.Cal. 1998); *In re AHN Homecare, LLC,* 222 B.R. 804 (Bankr.N.D.Tex.1998); *In re Southern Inst. for Treatment & Evaluation, Inc.,* 217 B.R. 962 (Bankr.S.D.Fla.1998).

There are two appellate decisions which have addressed the issue of Medicare recoupment in bankruptcy. The more recent, and the one this Court hereby adopts as its own, is the D.C. Circuit's 1997 decision of *United States v. Consumer Health Services of America, Inc.,* 108 F.3d 390. As a starting point for analysis, the D.C. Circuit quite properly recognized that 42 U.S.C. § 1395g(a) contemplates Medicare reimbursement as an ongoing stream of interim payments (based on estimates), with subsequent "necessary adjustments" whenever those interim payments (estimates) are found to have been inaccurate. *Id.* at 394. It follows, then, that the stream of payments and adjustments can only be characterized as a single transaction:

> ... In determining whether the pre-petition and post-petition services should be thought of as one transaction, the key ... is the Medicare statute. Since it requires [HHS] to take into account pre-petition overpayments in order to calculate [payment on] a post-petition claim ... Congress rather clearly indicated that it wanted a provider's stream of services to be considered one transaction for purposes of

any claim the government would have against the provider.

*Id.* at 395; *see also, Malinowski,* 156 F.3d at 134 (wherein the 2nd Cir. discusses the D.C. Circuit's *Consumer Health Services* decision with apparent approval for its effort "to ascertain the intent of Congress").

In deciding *Consumer Health Services,* the D.C. Circuit refuted the reasoning of the Third Circuit case of *In re University Medical Center,* 973 F.2d 1065 (3rd Cir.1992), the only other appellate case to have entertained this issue. The D.C.Circuit observed that a crucial problem with *University Medical Center* lies in the Third Circuit's failure to recognize "the importance of the language of the Medicare statute" at 42 U.S.C. § 1395g(a), with its system of interim payments subject to subsequent adjustments. *Consumer Health Serv.,* 108 F.3d at 394. The D.C. Circuit also looked askance at the Third Circuit's curious insistence that each Medicare fiscal year should be seen as a "transaction" unto itself, such that the Third Circuit would not find it "recoupment" if HHS withheld reimbursement in one fiscal year in order to make an adjustment for overpayments which occurred in another fiscal year. *Id.* at 395. The D.C. Circuit quite shrewdly recognized that the audit of a provider's cost documents for a given fiscal year was simply to give "a snapshot in time" in the interest of "efficien[cy]." *Id.* "It would seem to have little to do with how one conceptualizes the relation between past overpayments and current compensation due." *Id.*

The Third Circuit, based upon an apparent misconception of the nature of Medicare reimbursement, believed that "Medicare overpayments made to [University Medical Center] in 1985 [did not] arise from the same transaction, for the purposes of equitable recoupment, as Medicare payments due [to University Medicare Center] for services provided in 1988." *University Med. Ctr.,* 973 F.2d at 1081. The D.C. Circuit rejected this notion and correctly hewed more properly and more closely to the statute, which alone conceives, provides for, and dictates the terms of Medicare reimbursement. *See also, Southern Inst. for Treatment and Evalua-*

*tion, Inc.,* 217 B.R. at 966 (bankruptcy court "may not interfere with ... the statutory prescription that HHS make 'necessary adjustments' to current payment to account for previously rendered overpayments"); *Sims,* 225 B.R. 709 (also acknowledging the centrality of 42 U.S.C. § 1395g(a)).

 In the instant case, at any rate, this court need not even decide between the D.C. Circuit's and the Third Circuit's ideas of what constitutes a "transaction." On the facts of the instant case, the doctrine of recoupment directs that HHS must be allowed to withhold the Debtor's reimbursement, even under the Third Circuit's overly-restrictive conception. In December 1998, Palmetto determined that the Debtor has been overpaid $2,000,417 for the fiscal year ending June 30, 1999. That is, of course, the current fiscal year. The current fiscal year will not end for another four-and-a-half months. Therefore, HHS' current withholding is occurring within the same fiscal year as the overpayment which the current reimbursement is being withheld against. Hence, even under the Third Circuit's faulty notion of what constitutes a "transaction" in Medicare reimbursement, HHS' action necessarily constitutes recoupment against which the automatic stay does not apply.

 Ultimately what bears particular note is that there really are two bases for the propriety of HHS' withholding. These two bases are related, but they are legally separate and distinct. The one basis is the Medicare statute itself, without which there would be no such thing as Medicare reimbursement. The statute, at 42 U.S.C. § 1395g(a), contemplates and directs that adjustments will be made whenever it is determined that the interim payments previously disbursed were excessive. This is the fundamental payment provision which underlies Medicare

reimbursement. There is no evading it or circumventing it under any authority or at any time. The other basis is the common law doctrine of equitable recoupment. Recoupment is well-recognized as exempt from the operation of the automatic stay in bankruptcy. As the D.C. Circuit correctly concluded, either basis is sufficient to uphold HHS' withholding as fully proper. *Consumer Health Serv.,* 108 F.3d at 395.[2]

The Plaintiff states that it will suffer an irreparable injury if it does not obtain an injunction; however, the Plaintiff has failed to show the sort of injury which has been recognized as truly "irreparable."

The Sixth Circuit has recognized that monetary damages do not generally constitute irreparable harm. *Manakee Prof'l. Med. Transfer Serv. v. Shalala,* 71 F.3d 574, 581 (6th Cir.1995), citing *Sampson v. Murray,* 415 U.S. 61, 90, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974). Moreover, the Sixth Circuit has been unwilling to disturb the legal fabric of the Medicare program simply because a provider claims that it might otherwise face financial doom. In *Manakee,* the Sixth Circuit rejected the claim that lack of payment to a provider pending the administrative resolution of a Medicare reimbursement dispute would justify court intervention, even if the provider could be forced out of business in the interim, since the terms of the Medicare reimbursement methods are known to providers before they choose to contract with the Medicare program. *Manakee,* 71 F.3d at 581.

Also in *Manakee,* the Sixth Circuit cited with approval the important decision of the Eleventh Circuit in *VNA of Greater Tift County, Inc. v. Heckler,* 711 F.2d 1020 (11th Cir.1983), *cert. denied,* 466 U.S. 936, 104 S.Ct. 1908, 80 L.Ed.2d 457 (1984). *See also, Manakee,* 71 F.3d at 581. In *VNA,* the Eleventh Circuit noted that, in determining that a provider's being forced out of business could

---

**2.** This has implications not only for the future, but also for the Plaintiff's application for a turnover of reimbursement which has been withheld since the petition date. These funds are undeniably in dispute. The Plaintiff claims that HHS owes it those funds, while HHS maintains that the funds withheld were properly withheld under § 1395g(a) as a recoupment. "It is settled law that [a] debtor cannot use the turnover provisions [of the Bankruptcy Code] to liquidate contract disputes or otherwise demand assets whose title is in dispute." *U.S. v. Inslaw, Inc.,* 932 F.2d 1467, 1472 (D.C.Cir.1991). In creating turnover provisions, Congress intended that a debtor be allowed to obtain "not all funds, only those [which are] not in dispute." *In re Charter Co.,* 913 F.2d 1575, 1579 (11th Cir.1990). In the case at hand, the funds withheld are plainly in dispute. Therefore, as a matter of law, those funds cannot be subject to turnover.

not be accounted an irreparable injury, the problem of bankruptcy was "endemic" to a system filled with Medicare-heavy home health providers. *VNA*, 711 F.2d at 1034. The Eleventh Circuit pointedly observed that a provider knows the risks when it chooses to do business with Medicare. *Id.* Therefore, the court refused to find that the threat of agency closure was sufficient to justify any "fundamental deviation from the [Medicare] statutory scheme." *Id.*[3]

The Plaintiff appears to suggest that, absent injunctive relief, its home health patients will be left without necessary home health services. As a threshold consideration, only a Medicare home health patient has standing to raise this allegation. *Warth v. Seldin*, 422 U.S. 490, 508, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (proper plaintiff must demonstrate that "he personally would benefit in a tangible way" from court's intervention.) In any event, the Plaintiff has made no showing that there is any paucity of home health agencies in its service area. The Court notes to the contrary that there is a substantial number of home health providers serving the areas where the Plaintiff does business. Thus, the Court is well assured that the Plaintiff's Medicare beneficiaries will not go unserved.

HHS does not operate Medicare, ultimately, in HHS' own interest. Rather, this public agency is charged with protecting the interests of Medicare beneficiaries and with the effective management of the public funds entrusted to the Medicare program. HHS "has a critical interest in maintaining the integrity of the Medicare program for the benefit of all, including the taxpaying public." *Neurological Associates-H Hooshmand v. Bowen*, 658 F.Supp. 468, 473 (S.D.Fla.1987). Depletion of the Medicare trust fund by continuing to pay a Medicare provider to whom

an excess has already been paid violates HHS' public charge to effectively administer the Medicare Trust Fund. Moreover, HHS has an express congressional directive, at 42 U.S.C. § 1395g(a), to adjust the Plaintiff's future payments in order to recover the overpayments which were made in the interim payments previously disbursed to the Plaintiff. An order enjoining HHS (in effect) from complying with its statutory duty to recover the past overpayments would cause substantial harm to the Medicare program, and by implication, to all which it serves and for which it exists.

If HHS were required to continue disbursing funds to the Plaintiff before first recovering the already-determined excess, it would merely set itself up for the prospect of further overpayments, compounding the current overpayment problem even further. An overpayment can conceivably be determined any time a provider's costs (and other data) are reviewed. The Plaintiff's own recent history illustrates this. An overpayment was determined on each of two successive quarterly reviews in the previous fiscal year.

Furthermore, the Plaintiff is a PIP provider, whose interim payments are predicated on projections (by the provider) of the number of home health visits which the provider will be making to Medicare beneficiaries. Such projections are naturally subject to error or revision, again raising the prospect of an overpayment. The existence of currently-known overpayments means, in effect, that the provider has already been paid for services which it has not yet provided. To continue disbursing funds in that circumstance merely keeps the problem going and growing.

For these reasons, it is altogether possible that if HHS were required to continue mak-

3. Strongly worded comments from the Supreme Court indicate that the Court too plainly expects that the provider which does business with the Medicare program should know the law, its terms, and presumably, its various potential implications. In *Community Health Services of Crawford County*, 467 U.S. at 63, 104 S.Ct. 2218, the Court wrote that "protection of the public fisc requires that those who seek public funds act with scrupulous regard for the requirements of law." A health care provider should "expect no less than to be held to the most demanding standards in its quest for public funds." *Id.* And that provider ha[s] a duty to familiarize itself with the legal requirements of the Medicare reimbursement method. *Id.* at 64, 104 S.Ct. 2218. In light of these emphatic remarks, it does not appear that the Supreme Court would be inclined to account the plight of an individual provider as a basis for cicumventing the system created by Congress.

ing disbursements to the Plaintiff, further and additional overpayments could occur. The Medicare Trust Fund could suffer further loss. Ultimately, all who are the beneficiaries of the Medicare program would indeed remain at risk for future harm.

The public interest is critically at stake in the instant matter. The Sixth Circuit has made it clear in whose interest the Medicare program operates. That court has recognized on repeated occasions that Medicare-a social insurance program-was designed expressly for the benefit of elderly and disabled citizens. Medicare was not instituted by Congress with the express aim and purpose of benefitting health care providers. The considerable business benefit that providers may derive from participating in the Medicare program is purely incidental to the program's actual aim and design as a health insurance system. *See, Baptist Hosp. E. v. Secretary of Health and Human Serv.*, 802 F.2d 860, 868 (6th Cir.1986) ("In enacting the Medicare program, Congress did not primarily seek to ensure the financial viability of individual health care institutions, but sought to ensure adequate health care for a specific group of people."); *Chelsea Community Hosp. v. Michigan Blue Cross Ass'n*, 630 F.2d 1131, 1136 (6th Cir.1980) ("The Medicare Act does not ... show any legislative intent to aid providers of care for their own sakes."); *Green v. Cashman*, 605 F.2d 945, 946 (6th Cir.1979) ("We do not find in the statute authorizing Medicare ... any legislative intention to provide financial assistance to providers of care for their own benefit. Rather the statute is designed to aid the patients and clients of such facilities....."). HHS' purpose and function in administering Medicare is to serve the interests of the elderly and disabled individuals who are the program's express and intended beneficiaries.

The public interest would be grievously disserved if HHS were required to continue payments under the circumstances of this case before first recouping the overpayments previously made to the Plaintiff. *Psychiatric Care Day Hosp. Ctr. v. Shalala*, 876 F.Supp. 260, 263 (N.D.Ala.1994) (citing such harm to the Government in denying relief). The Medicare Trust Fund would be drawn upon improperly. The very terms of the Medicare reimbursement methods enacted by Congress would be disregarded. Future overpayments could occur, without first a recovery of the quite substantial past overpayments which are already known to have occurred. These consequences would all plainly disserve the public interest. There is no evidence to even suggest that Medicare home health patients would go without services. Considered in the light of the public interest, the calculus of potential outcomes clearly favors the maintenance of the status quo.

The Plaintiff has failed to carry its burden of showing that it is entitled to injunctive relief. The Plaintiff has not established any likelihood of prevailing on the merits, in light of the express statutory directive in the payment provision of the Medicare statute, 42 U.S.C. § 1395g(a), and in light of the doctrine of recoupment, either of which authorizes HHS' withholding in this case. Moreover, relevant pronouncements from the Sixth Circuit and the Supreme Court indicate that the Plaintiff cannot establish irreparable injury. The issuance of an injunction would subvert the will of Congress and would pose harm to the Medicare Trust Fund and to its beneficiaries, present and future. Additionally, the issuance of an injunction would gravely disserve the public interest.

## III. ORDER

It is therefore **ORDERED** that Plaintiff's Application for a Preliminary Injunction is **DENIED**.

**IT IS SO ORDERED.**