**In re MIRANT CORPORATION, et al., Debtors.**

**Sacramento Municipal Utility District, Plaintiff,**

**v.**

**Mirant Americas Energy Marketing, LP, Defendant.**

**Bankruptcy No. 03–46590.
Adversary No. 04–04094–DML.**

United States Bankruptcy Court,
N.D. Texas,
Fort Worth Division.

Sept. 1, 2004.

Judith Elkin, Haynes & Boone, Dallas, for Mirant Americas Energy Marketing, LP, Defendant.

Christopher D. Johnson, Diamond, McCarthy, Taylor & Finley, Houston, TX, Wendy K. Laubach, Diamond, McCarthy, Taylor, Finley et al., Houston, TX, Jason M. Rudd, Diamond, McCarthy, Taylor & Finley, Houston, TX, for Plaintiff.

Thomas E. Lauria, White and Case, LLP, Miami, FL, Ian T. Peck, Haynes and Boone, Ft. Worth, TX, Robin Eric Phelan, Haynes and Boone, Dallas, TX, for Defendant.

### *Memorandum Opinion*

DENNIS MICHAEL LYNN, Bankruptcy Judge.

Before the court are cross motions for summary judgment (the "SMUD Motion", the "MAEM Motion", and collectively the "Motions") filed by Mirant Americas Energy Marketing, L.P. ("MAEM") and Sacramento Municipal Utility District ("SMUD") in the above-styled adversary proceeding (the "Adversary"). The parties have briefed the issues to the court, and the court heard argument on July 21, 2004. The court has before it summary judgment evidence consisting of affidavits and documents, described as required be-

low. This matter is subject to the court's jurisdiction pursuant to 28 U.S.C. §§ 1334(b) and 157(b)(2). This memorandum opinion constitutes the court's findings and conclusions. FED. R. BANKR. P. 7052.[1]

## I. Background

As of June 3, 1998, SMUD and MAEM's predecessor[2] entered into SMUD Master Natural Gas Purchase Agreement No. H–554 (the "Master Agreement"). Pursuant to the Master Agreement, MAEM agreed to sell to SMUD natural gas in transactions to be memorialized in Confirmation Letters (Master Agreement ¶¶ 4.1 and 5.1). The Confirmation Letters were to constitute "integral part[s]" of the Master Agreement (Master Agreement ¶ 4.5).

The procedure followed by the parties for entering into transactions is provided by ¶ 5.1 of the Master Agreement. SMUD would "invite" MAEM to offer to sell gas to SMUD. SMUD could accept or reject any offer made. If SMUD accepted MAEM's offer, it was to deliver to MAEM a Confirmation Letter. If MAEM did not object to a Confirmation Letter within five business days, the Confirmation Letter became binding on the parties. The Confirmation Letter would include price, timing and other specifics of the transaction (Master Agreement ¶ 4.1). The Master Agreement had an initial term of one year and was thereafter evergreen subject to termination on 30 days notice (Master Agreement ¶ 2.1); Confirmation Letters bridging a termination would continue to be governed by the Master Agreement until the transactions contemplated by the Confirmation Letters were completed. (*Id.*).

Beginning on July 14, 2003, MAEM and a number of its affiliates (collectively "Debtors") commenced chapter 11 cases in this court. At that time, MAEM and SMUD were parties to Confirmation Letters dated October 2, 2001, March 13, 2002, March 20, 2002 and March 25, 2002. The transactions memorialized in these Confirmation Letters covered sales of gas for periods beginning and ending at various times, including the months following commencement of Debtors' cases. The earliest completion date for any of the Confirmation Letters was December 31, 2003.

Following commencement of its chapter 11 case, MAEM continued to perform under the Master Agreement, delivering gas to SMUD as required by the Confirmation Letters through November 30, 2003. On October 22, 2003, however, MAEM filed a motion to reject the Master Agreement and outstanding Confirmation Letters. On November 6, 2003, the court entered an order approving the rejection of the Master Agreement and the Confirmation Letters.[3]

SMUD subsequently filed a proof of claim in the amount of $2,812,684 (the "Claim"), based on MAEM's rejection of the Master Agreement and Confirmation Letters. *See* section 365(a) and 502(g) of the Bankruptcy Code (the "Code").[4]

---

**1.** The court commends counsel for both parties for their professionalism in the conduct of the Adversary. Counsel have worked together to make this court's task easier while each has effectively presented the client's position. This sort of professionalism reflects well on counsel and is appreciated by the court.

**2.** MAEM and others of Debtors (as hereafter defined) were spun-off by Southern Energy, Inc. in 2001.

**3.** Certain orders entered by the court to protect Debtors' trading partners are inapplicable in this case as SMUD is a governmental unit. *See In re Mirant Corp.,* 303 B.R. 319, 326–27 (Bankr.N.D.Tex.2003) (app.pending).

**4.** 11 U.S.C. § 101 *et seq.*

SMUD further asserted a right to recoup its Claim from $2,007,487.69 owing to MAEM (the "Postpetition Payable") for gas deliveries made in October and November 2003. Pursuant to an agreed order dated March 18, 2004, the parties agreed that SMUD would pay MAEM the Postpetition Payable but would reserve the right to recover that payment should it be determined that it was entitled to recoup from it the Claim. SMUD subsequently commenced the Adversary to invoke and enforce the doctrine of recoupment in order to recover the Postpetition Payable.

## II. Issue

The issue before the court is quite narrow: may SMUD, a party to an executory contract with a chapter 11 debtor, MAEM, recoup from amounts due for that debtor's postpetition performance a claim arising from that debtor's rejection of that contract.

## III. Standard for Summary Judgment

Summary judgment is proper when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c). *Jenkins v. Chase Home Mortgage Corp.*, 81 F.3d 592, 595 (5th Cir.1996). It is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," when viewed in the light most favorable to the non-moving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In the case at bar, there is no dispute regarding the facts. Thus, summary judgment is appropriate.

## IV. Discussion

### A. Doctrine of Recoupment

■ The doctrine of recoupment "originated as an equitable rule of joinder that allowed adjudication in one suit of two claims that would otherwise have to be brought separately." *United States Abatement Corp. v. Mobil Exploration and Producing U.S. Inc. (In re United States Abatement Corp.)*, 79 F.3d 393, 398 (5th Cir.1996); *Howard Johnson, Inc., of Florida v. Tucker*, 157 F.2d 959, 961–62 (5th Cir.1946); *ABCO Industries, Inc., v. ESI, Inc., of Tennessee (In re ABCO Inc.)*, 270 B.R. 58, 61–62 (Bankr.N.D.Tex.2001). Recoupment was, and for such purposes remains, a rule of pleading that allowed, where equitable, assertion as a defense to a cause of action of a claim arising from the same transaction as that underlying the cause of action. In *Howard Johnson*, though a bankrupt estate was involved, recoupment was so asserted by a defendant in litigation. *See, similarly, Kadonsky v. United States*, 216 F.3d 499, 507–08 (5th Cir.2000) (though government's award of money by administrative forfeiture proceeding was unconstitutional due to insufficient notice and was barred by statute of limitations, government permitted to assert recoupment as a counterclaim against plaintiff who sought return of money government had seized in connection with plaintiff's arrest); *REW Enters., Inc. v. Premier Bank, N.A.*, 49 F.3d 163, 171 (5th Cir.1995) (non-bankruptcy case in which defendant's counterclaim for recoupment was granted to ensure that the plaintiff did not "receive a windfall as result of its rescission of [an] ultra vires contract"). This use of recoupment is not the way SMUD wishes it applied in this bankruptcy case.

■ Recoupment plays a somewhat different role in bankruptcy in that it allows a party to reduce an obligation otherwise payable to a bankruptcy estate by the amount of a claim against the estate. The party asserting recoupment may even re-

duce the payable due the estate without regard to the automatic stay. *Holford v. Powers (In re Holford)*, 896 F.2d 176, 179 (5th Cir.1990); *In re Kosadnar*, 157 F.3d 1011, 1016 (5th Cir.1998); *AHN Homecare, LLC v. Home Health Reimbursement and Health Care Fin. Admin. (In re AHN Homecare, LLC)*, 222 B.R. 804, 811–12 (Bankr.N.D.Tex.1998).[5] Not only is recoupment (as opposed to setoff; *see* Code § 362(a)(7)) exempt from the automatic stay; more importantly for purposes of the Adversary, unlike the doctrine of setoff, recoupment allows reduction of a *prepetition* claim *against* the debtor by application of the claim to reduce a *post-petition* obligation *to* the debtor. *See Kosadnar*, 157 F.3d at 1014. *Cf.* Code § 553 ("[T]his title does not affect any right of a creditor to offset a mutual debt ... *that arose before the commencement of the case* ... against a claim ... against the debtor *that arose before the commencement of the case* ...." (emphasis supplied)).

There is dispute about what must be shown in order for the doctrine of recoupment to apply. It is clear that the decision to allow recoupment is to be made on a case-by-case basis. *Kosadnar*, 157 F.3d at 1015. The court also concludes that, as an equitable exception to the normal rules of bankruptcy,[6] the doctrine of recoupment should be narrowly applied.[7] *Herod v. Southwest Gas Corp. (In re Gasmark)*, 193 F.3d 371, 375 (5th Cir.1999); *U.S. Abatement*, 79 F.3d at 398; *ABCO*, 270 B.R. at 61.

There seems to be consensus that the claims of both debtor and creditor must arise out of the "same transaction" in order for recoupment to apply. What is much less clear is what constitutes the "same transaction." While it is typically true (as in the case at bar) that a single contract is the source of both claims, that the claims arise under the same contract is not dispositive of the "same transaction" requirement. As the Court of Appeals stated in *Kosadnar* (157 F.3d at 1015):

There is no general standard governing whether events are part of the same or different transactions. "Given the equitable nature of the [recoupment] doctrine, courts have refrained from precisely defining the same-transaction standard, focusing instead on the facts

---

**5.** The party wittingly ignoring the stay, of course, bears the burden of showing the propriety of recoupment. SMUD wisely chose to preserve its right to assert recoupment without running the risk the doctrine might prove inapplicable in this case.

**6.** As noted by commentators and courts, there is no mention of "recoupment" in the Code. *See Centergas, Inc. v. Conoco, Inc. (In re Centergas, Inc.)*, 172 B.R. 844, 849 (Bankr. N.D.Tex.1994); 5 COLLIER ON BANKRUPTCY ¶ 553.10 (15th ed. rev.2004). Having done its best to digest the numerous authorities submitted by the parties, the court perceives "recoupment" in bankruptcy as legally justifiable on roughly the same basis as is recognition of equitable title: just as equitable title arguments depend on a showing that an entity other than the estate is beneficial owner of property, so, with recoupment, the equitable

circumstances must be such that the amounts owed by the creditor to the debtor are not property of the estate, being rather subject to the prior, equitable claim of the creditor. *See, e.g., U.S. Abatement*, 79 F.3d at 398.

**7.** Equitable, as opposed to statutory, exceptions to the automatic stay must be construed narrowly not only as to entitlement but as to scope in order to be consistent with the limited equitable powers of the bankruptcy courts. *See Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988) ("[W]hatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code."); *Southmark Corp. v. Grosz (In re Southmark Corp.)*, 49 F.3d 1111, 1116 (5th Cir.1995) (Code § 105(a) does not allow bankruptcy courts to act as roving commissions to do equity).

and the equities of each case." (brackets in original) (quoting *United States v. Dewey Freight Sys., Inc., (In re Dewey Freight Sys., Inc.)*, 31 F.3d 620 (8th Cir.1994)).

Moreover, the law is not clear what is required to invoke recoupment beyond meeting the same-transaction standard. In *Kosadnar*, the Fifth Circuit Court of Appeals stated (157 F.3d at 1014):

> There are two general requirements to characterizing a withholding [of payment to the debtor] as recoupment—first, some type of overpayment must have been made, and, second, both the creditor's claim and the amount owed to the debtor must arise from a single contract or transaction.

On the other hand, just a few years earlier, in *U.S. Abatement*, the Fifth Circuit observed (79 F.3d at 398, n. 11):

> The district court concluded that, to be entitled to recoupment, Mobil needed to establish not only that the claims ... arose out of a single transaction, but also that it has made overpayments to [debtor]. The court cited no authority that substantiates this "overpayment requirement," and we have found none.

The Fifth Circuit's most recent pronouncement of the prerequisites to a valid claim of recoupment is found in *Gasmark* (193 F.3d at 375), where the Court, having noted the absence of an "overpayment requirement," went on to say:

> Our review of this record finds no inequities accruing to Southwest that are in any way comparable to the buyer who has overpaid the seller. In the absence of injury to Southwest or benefit or enrichment to Gasmark, we feel no equitable tug ... that supports application of the narrow doctrine of recoupment.

Based on the foregoing, the court concludes that an overpayment or something like it is required to trigger recoupment. In all the cases the court has read, harm to a creditor or benefit to a debtor in excess of that contemplated by the Code has been an element necessary to application of the doctrine of recoupment in a bankruptcy case. *See, e.g., U.S. Abatement*, 79 F.3d at 395 (recoupment of defendant's payment of liens asserted by debtor's subcontractors); *Kosadnar*, 157 F.3d at 1011 (overpayment of insurance commissions); *Ashland Petroleum Co. v. Appel (In re B & L Oil Co.)*, 782 F.2d 155, 155 (10th Cir.1986) (overpayment for oil); *Sec. Pac. Nat'l Bank v. Enstar Petroleum Co. (In re Buttes Res. Co.)*, 89 B.R. 613, 614 (S.D.Tex.1988) (recoupment of operating expenses due from debtor from production proceeds). In each of these cases recoupment prevented a debtor from receiving double value or a creditor from paying twice for debtor's performance.

## B. Application of the Doctrine of Recoupment to the Adversary

■ The court now turns to the Adversary. Although most cases studied by the court have suggested that the "same-transaction requirement" is met by off-setting performances, and despite the court's doubt that anticipatory breach[8] under section 365(a) of the Code by MAEM is sufficiently related to SMUD's obligation to pay for delivered gas to meet that requirement, the court will assume that the "same-transaction requirement" has been met.

The court, however, is unable to find cause to invoke its equity powers in the case at bar. The Postpetition Payment was made for gas actually delivered. The gas was purchased with postpetition dollars and, dollar for dollar, will have re-

---

8. *See, generally,* 3 COLLIER ON BANKRUPTCY ¶ 365.09 (15th ed. rev.2000).

duced MAEM's chapter 11 estate if SMUD is permitted to recoup the Claim. Denial of recoupment will not leave SMUD paying twice for the same performance or MAEM receiving a windfall through double-dipping.

■■■ Congress contemplated that claims arising from rejection of a contract [9] by a chapter 11 debtor would exist on a parity with other unsecured claims. Code §§ 365(g)(1) and 502(g). *See also NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 531, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984) (damages resulting from rejection of executory contract "receive the priority provided general unsecured creditors"); *K–4, Inc. v. Midway Engineered Wood Prods, Inc. (In re TreeSource Indus., Inc.),* 363 F.3d 994, 998 (9th Cir.2004) ("[A] rejection creates a breach of a lease deemed to occur immediately before the petition date, thereby giving rise to a general unsecured claim for rejection damages."); *Stewart Foods, Inc. v. Broecker (In re Stewart Foods, Inc.),* 64 F.3d 141, 144 (4th Cir. 1995) ("The rejection of an executory contract constitutes a breach of the contract, and a party's damages resulting from that rejection are treated as a pre-petition claim and receive the priority provided to general unsecured creditors."). Congress was equally concerned that the estate created by Code § 541, including a chapter 11 debtor's postpetition revenues, would not be burdened by claims of unsecured creditors, including claims arising from rejection of contracts. *Mason v. Official Comm. of Unsecured Creditors (In re FBI Distrib. Corp.),* 330 F.3d 36, 45 (1st Cir. 2003) (goal of chapter 11 is "the successful rehabilitation of the business for the benefit of both the debtor and all its creditors" and court approval prior to assumption of contracts is essential to protect the estate from burdensome contracts that "may have driven the business into bankruptcy in the first place"); *United States ex rel. IRS v. Norton,* 717 F.2d 767, 770 (3d Cir. 1983) (tax claims not given priority usually not collectible from debtor's post-bankruptcy assets to avoid "hampering debtor's fresh start") (citing S.Rep. No. 1106, 95th Cong., 2d Sess. (1978) (Committee on Finance)); *In re Shoemaker,* 155 B.R. 552, 556 (Bankr.N.D.Ala.1992) (approving settlement in part to prevent estate from being burdened by "yet another unsecured claim"); *In re Hardie,* 100 B.R. 284, 285 (Bankr.E.D.N.C.1989) (rejection of contracts "is fundamental to the bankruptcy system because it provides a mechanism through which severe financial burdens may be lifted while the debtor attempts reorganization").

Here, MAEM received no benefit like a prepayment; the benefit to MAEM is in conversion of the value of its contractual obligations to SMUD into an unsecured claim. That the Claim should receive unsecured treatment is entirely consistent with Congress's purposes and the relief MAEM could reasonably expect in chapter 11. Likewise, SMUD is not unduly harmed by being treated as Congress contemplated a debtor's contract parties would be treated. Surely the court feels no equitable compunction in denying to

---

**9.** *Holford,* one of the better cases from Plaintiff's perspective, is inapposite, not only in that both debtor's performance and the other party's tortious harm continued postpetition but also given the peculiar treatment of leases where debtor is the lessor. *See* Code § 365(h)(1) (permitting (1) continued possession by non-debtor and (2) offset against rent by non-debtor for postpetition failures in performance resulting from debtor-lessor's rejection). Thus, in *Holford,* whether the lease was rejected or the lease was assumed, debtor's tenant could offset against his rent any loss suffered through debtor's failure to perform.

SMUD special advantage by reason of the fortuity of its receipt from MAEM of postpetition gas deliveries.

The court is inclined to agree with the Court of Appeals for the Eighth Circuit. That Court held in *Dewey* that, to allow recoupment of a claim arising through rejection of a contract against a debtor's postpetition performance, would "frustrate both the specific commands of § 365(g)(1) and § 502(g)" and the basic purpose of chapter 11. *Dewey,* 31 F.3d at 625. This court finds the reasoning in *Dewey* persuasive. Further, while the holding in *Dewey* has not been adopted by the Fifth Circuit Court of Appeals, the case has been cited by the Fifth Circuit with approval (*see, e.g., Kosadnar,* 157 F.3d at 1015, quoted above, p. 381), and the court finds no inconsistency between *Dewey* and any controlling precedent.

## V. Conclusion

For the foregoing reasons, the court holds that SMUD may not recoup the Postpetition Payment against the Claim. The SMUD Motion is therefore denied and the MAEM Motion granted. Counsel for Defendant shall prepare and submit to the court a judgment consistent with this memorandum opinion, denying Plaintiff all relief in this Adversary and providing each party shall bear its respective costs.