**UNITED STATES of America, Appellant,**

**v.**

**CONSUMER HEALTH SERVICES OF AMERICA, INC. and Roger Schlossberg, Trustee, Appellees.**

**No. 96–5148.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 21, 1997.

Decided March 18, 1997.

---

Jeffrey A. Clair, Attorney, United States Department of Justice, Washington, DC, argued the cause for appellant, with whom Frank W. Hunger, Assistant Attorney General, Eric H. Holder, Jr., United States Attorney, and William G. Kanter, Deputy Director, United States Department of Justice, were on the briefs. R. Craig Lawrence, Assistant United States Attorney, entered an appearance.

Roger Schlossberg, Hagerstown, MD, argued the cause and filed the briefs for appellees.

Before: SILBERMAN, SENTELLE, and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

Concurring opinion filed by Circuit Judge SENTELLE.

SILBERMAN, Circuit Judge:

The United States appeals the district court's affirmance of the bankruptcy court's denial of its motion to deduct prior Medicare overpayments from reimbursement otherwise due the appellees. We reverse.

## I.

Consumer Health Services of America was a provider of home health care services. In 1976, it signed a Medicare provider agreement that qualified it to participate in Medicare Part A, which compensates providers of certain health care services for the elderly in accordance with regulations promulgated by the Secretary of Health and Human Ser-

vices.[1] To ensure that Medicare service providers such as Consumer are paid promptly, the Medicare statute provides for periodic payments for services on an estimated basis prior to a determination of the exact amount of reimbursement due for those services. These interim payments, to be made not less often than monthly, are calculated and made by a "fiscal intermediary" designated by the Secretary. At the end of each "reporting period" (the length of which is currently set at one year), the intermediary audits the provider to determine whether the provider has been over or underpaid, and by how much. While the provider is obliged to submit its "cost report" to the intermediary within five months of the close of a cost period, the intermediary must only complete the audit within a reasonable time.

When the audit is completed, the service provider is subject to a "retroactive adjustment." If the provider has been underpaid, it receives a "final adjustment" amounting to the difference between "the reimbursement due" and "the payments made." If the provider has been overpaid, it need not necessarily remit the balance of the overpayment immediately. Although the intermediary may suspend a provider's authorization to participate in Medicare if the provider's account is out of balance, the regulations also provide for an arrangement by which the intermediary and the provider may "enter[ ] into an agreement ... for liquidation of the overpayment." The agreement envisaged by this regulation is quite simple: the provider will keep performing Medicare services, and the intermediary will deduct from its periodic payments amounts to be applied to liquidation of the prior overpayment. In determining how much to deduct, the intermediary balances two objectives: it wants to liquidate the debt, but it also wants to ensure that the provider has sufficient incentive to continue performing needed services.

In 1984, Consumer's fiscal intermediary concluded its audit for 1981–82 and determined that it had overpaid Consumer by approximately $81,000. Pursuant to an "agreement ... for liquidation of the over-

1. See 42 U.S.C. §§ 1395g(a), 1395x(v)(1)(A) (1994); 42 C.F.R. §§ 405.370(a)(1), 405.373(a)(2), 413.20(b), 413.24(f)(2)(i), 413.64(f) (1995).

payment," the intermediary began deducting from Consumer's periodic payments amounts necessary to recover the excess. In 1987, Consumer petitioned to reorganize its business under Chapter 11 of the Bankruptcy Code. At that time, Consumer still owed over $32,000 on the 1981–82 overpayments. Operating under Chapter 11, Consumer continued to provide Medicare services and to receive periodic payments. Its intermediary did not, however, continue to deduct the amounts attributable to the 1981–82 overpayment, because it was uncertain concerning the legal issue in this case—whether such deductions would violate the Bankruptcy Code's automatic stay of actions to recover pre-petition debts. After a little more than a year of operation under Chapter 11, Consumer converted its bankruptcy case into a liquidation proceeding under Chapter 7, and it submitted claims for reimbursement for Medicare services performed during the period it was operating under Chapter 11. Assuming no deduction for the 1981–82 overpayments, the intermediary estimated that these claims amounted to about $15,000.[2] The government then brought a motion in the bankruptcy court requesting "that the court affirm [its] right to reduce payments due to account for prior overpayments."

For reasons not apparent from the record, the matter was pending before the bankruptcy court for six years, and then, after the *Third Circuit* decided a virtually identical case, *see In re University Medical Center,* 973 F.2d 1065 (3d Cir.1992), the bankruptcy court denied the government's motion. The court assumed the Bankruptcy Code's automatic stay applied to the government's claim for the pre-petition overpayments, and so it saw the issue as whether the government was entitled "to make recoupment" on the provider agreement between Consumer and the Secretary. The court characterized the agreement as an "executory contract," *i.e.,* a contract on which performance is due from both parties, and it recognized that if Consumer could be said to have "assumed" the contract, "the contract would be enforceable ... and the Secretary's withholding of payments would merely be the exercise of a

contractual right." The court rejected, however, the argument that Consumer's post-petition provision of Medicare services constituted assumption of the contract. It relied on the prevailing view that a debtor operating under Chapter 11 cannot "assume" an executory contract without formal approval by the bankruptcy court, which the parties agreed had been neither sought nor received. The court also rejected the government's claim for "equitable recoupment," under which a creditor may deduct a pre-petition debt from payments for post-petition services, if (and only if) the debt and the services are part of a single "transaction." According to the court, under the Medicare statute and regulations, "the amount due the provider for one year [*i.e.,* the pre-petition debt] stems from services completely unrelated to those provided in later years [*i.e.,* the post-petition services]." It thus concluded that the government's claim for overpayments made in 1981–82 and calculated in 1984 was not part of the same transaction as Consumer's claim for compensation for services performed in 1987–88. Finally, relying on *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), the bankruptcy court determined that even though performance under the provider agreement did not amount to assumption of it, Consumer was still entitled to the "reasonable value" of the Medicare services it provided while operating under Chapter 11.

The government appealed to the district court, which affirmed in a one-sentence order embracing the reasoning of the bankruptcy court. This appeal followed.

## II.

The government's primary contention is that the bankruptcy court failed to recognize that the amount of Medicare's substantive liability for *any* services rendered (including those rendered by a debtor operating under Chapter 11) must *by statute* take into account prior overpayments. In the alternative, the government argues that it should be able to deduct the overpayments under the

---

**2.** Although the intermediary initially estimated that Consumer performed $15,000 worth of post-petition services, it appears that it may have revised the estimate to $21,000.

doctrine of equitable recoupment, since those overpayments and the post-petition services were part of a single transaction. We see these two arguments not as true "alternatives" but rather as closely related.

■ The Medicare statute provides that the amount due for Medicare services be calculated as follows:

The Secretary shall periodically determine the amount which *should* be paid under this part to each provider of services with respect to the services furnished by it, and the provider of services *shall* be paid, at such time or times as the Secretary believes appropriate (but not less often than monthly) and prior to audit or settlement ... the amounts so determined, *with necessary adjustments on account of previously made overpayments* or underpayments. 42 U.S.C. § 1395g(a) (emphases added).

The statute quite clearly says that the government is liable for particular Medicare services only in the amount that "shall be paid," and that amount consists of what the Secretary has determined "should be paid" for those services, *less adjustments for prior overpayments*. The bankruptcy court's decision, which did not focus on the statute's actual language, had the effect of eliminating from the statute the words "with necessary adjustments on account of previously made overpayments" when a provider seeks the protection of the bankruptcy law.

The Third Circuit's decision in *In re University Medical Center* had the same effect. In evaluating the Secretary's claim to deduct prior overpayments from the amount due on post-petition services, the court began its discussion with an overview of the Bankruptcy Code's "automatic stay," *see* 11 U.S.C. § 362(a) (1994), which the court rightly explained stops collection attempts in order "to replace the 'unfair race to the courthouse' with orderly liquidation that treats all creditors equally." 973 F.2d at 1074 (quoting *United States v. Nicolet, Inc.,* 857 F.2d 202, 207 (3d Cir.1988)). The court noted that the automatic stay by its terms applies to "all entities," which includes "governmental units." *Id.* (citing 11 U.S.C. § 362(a) and § 101(14)). Since the government as a con-

tracting party is generally subject to the automatic stay, and since the court viewed the prior overpayments as a debt arising pre-petition, it saw the issue as whether the government could avoid the stay. The Third Circuit thus considered whether the debtor had "assumed its provider agreement" or whether the Secretary "was entitled to recoup the pre-petition overpayments through withholding [the debtor's] post-petition reimbursement." *Id.* at 1075. And like the bankruptcy court below, the Third Circuit answered both these questions in the negative, concluding that its resolution best "harmoniz[ed]" the bankruptcy and Medicare "policies." *Id.* at 1084.

We think the Third Circuit, and the bankruptcy court below, overlooked the importance of the language of the substantive Medicare statute. Those courts assumed that the amount due on post-petition services was to be determined by the regulations detailing how much a provider normally gets for the services rendered. Only then, after that determination, did the courts inquire into whether the prior overpayments could be deducted from the amount due. And in completing that inquiry, the courts looked to principles governing pre-assumption performance of executory contracts by debtors operating under Chapter 11. As we have explained, we disagree with the premise that the "amount due" should be calculated with reference to the fee schedule set out in the regulations. That fee schedule only determines what "should be paid"; the amount actually due under the statute is the amount which "shall be paid"—which includes "necessary adjustments for prior overpayments." In this case, then, the amount due is the approximately $15,000 Consumer "should be paid" for post-petition services rendered, less the "necessary" adjustment for the as-yet-unremitted overpayments. To conclude otherwise, we think, would allow the Bankruptcy Code to modify an explicit statutory scheme defining liability for particular services. Neither the trustee, the bankruptcy court, nor the Third Circuit in *In re University Medical Center* has offered authority for the proposition that the Bankruptcy Code can act to override an explicit statutory limitation on

what the government owes for a particular service. That the limitation in question is defined by the amount the government has previously (over)paid to the provider does not, in our view, alter the analysis.

■ Nor does our analysis differ significantly under the doctrine of equitable recoupment, which exempts a debt from the automatic stay when the debt is inextricably tied up in the post-petition claim. *See generally In re B&L Oil,* 782 F.2d 155, 156 (10th Cir.1986); Howard C. Bushman III, *Benefits and Burdens: Post–Petition Performance of Unassumed Executory Contracts,* 5 BANKR. DEV. J. 341, 352–53 (1988).

■ Whether the recoupment exception applies in a particular case turns on whether the creditor's and debtor's respective claims arise out of the same "transaction," and what exactly constitutes a "transaction" is not readily apparent from the caselaw. In *In re University Medical Center,* the court rejected an "open-ended" definition of "transaction" in favor of a "stricter" requirement that "both debts . . . arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of that transaction without also meeting its obligations." 973 F.2d at 1080–81. The court concluded that the annual account reconciliation process described above defined the scope of any single transaction under Medicare Part A. The Third Circuit thought that since the provider's account was reconciled each year, any particular pre-petition monthly payment should be thought to apply to the services rendered that month and any prior overpayment that had given rise to a "retroactive adjustment." The payment could not be construed as an "advance payment[ ]" for future services. Thus, the provider's "post-petition services were the beginning of transactions that would stretch into the future, but they were not part of the [pre-petition] transactions." 973 F.2d at 1081–82.

Even under the Third Circuit's stricter standard,[3] we believe that Consumer's claim for post-petition services and the pre-petition overpayments qualify. Unlike the Third Circuit, we do not think the frequency of the audit appropriately defines the "transaction." The audit is simply the mechanism by which the intermediary determines whether and by how much it ought to adjust subsequent periodic payments to a particular provider. Its frequency is determined by the Secretary, presumably in the interests of an efficient reimbursement scheme; it would seem to have little to do with how one conceptualizes the relation between past overpayments and current compensation due. It is the statute and regulations which dictate the *effect* of the audit on the provider's participation in Medicare. An audit is nothing more than a snapshot in time—whether it is monthly, annual, or decennial is, in our view, irrelevant.

In determining whether the pre-petition and post-petition services should be thought of as one transaction, the key to us is the Medicare statute. Since it requires the Secretary to take into account pre-petition overpayments in order to calculate a post-petition claim—as we have described above—Congress rather clearly indicated that it wanted a provider's stream of services to be considered one transaction for purposes of any claim the government would have against the provider. The Third Circuit said that "[t]he [pre-petition] overpayments . . . cannot be deemed advance payments for [the provider's subsequent] services." *Id.* at 1081. That observation, in our view, is contrary to manifest congressional intent. In sum, it does not matter whether we consider the government's claim in terms of its statutory substantive liability or in terms of the equitable recoupment doctrine. Under either analysis, the automatic stay is of no consequence. *Accord In re Harmon,* 188 B.R. 421, 425 (9th Cir. BAP 1995).

The trustee contends that this conclusion will have the effect of prioritizing Medicare

---

**3.** The trustee did not embrace the Third Circuit's standard here, opting for a standard drawn from Federal Rule of Civil Procedure 13(a), which governs compulsory counterclaims—the very argument the Secretary made, but lost, in *In re University Medical Center. See* 973 F.2d at 1080–

81. *Compare United States v. Aquavella,* 615 F.2d 12, 22 (2d Cir.1979) (government's claim on prior overpayments is a compulsory counterclaim to a provider's claim for compensation for services rendered).

debts, a result which is at odds with the Bankruptcy Code's automatic stay as well as with its explicit listing of what debts have priority following a bankruptcy petition. *See* 11 U.S.C. § 362(a), § 507. We do not hold, however, that all Medicare claims for prior overpayments avoid the automatic stay. A provider that is no longer providing Medicare services, whether or not it is in Chapter 11, is subject to a collection remedy defined by statute and regulation. *See* 31 U.S.C. §§ 3701, 3711, 3716–18 (1994); 42 C.F.R. § 405.374. Our decision does not purport to govern the effect of a petition for bankruptcy on a claim by Medicare for reimbursement of prior overpayments when the provider in question does not continue to provide services post-petition.

### III.

As is apparent, our analysis is driven by the explicit statutory directive that, in compensation for its services rendered post-petition, Consumer "shall be paid" the amount the Secretary has determined it "should be paid," "with necessary adjustments on account of previously made overpayments." 42 U.S.C. § 1395g(a). The amount Consumer "should be paid" is approximately $15,000. What it "shall be paid," then, turns on what adjustments are "necessary."

■■■ The government would have us decide that the "necessary" adjustment in this case is the entire outstanding balance on the 1981–82 overpayments, $32,000. Such a deduction would leave the trustee owing approximately $17,000, a debt which would presumably be treated as a run-of-the-mill prepetition claim. The statute itself does not really mandate the government's reading, however. It is not entirely clear what Congress meant by "necessary," or, to put it another way, what is necessary in any given case may involve drawing a balance between what would be the quickest repayment to the government, and what would give the provider sufficient incentive to continue providing services. As Congress has not "spoken unambiguously to the precise issue at hand," we turn to "the agency's action under 'Step Two' of *Chevron*, and defer to the agency's interpretation if it represents a 'permissible construction' of the statute." *Consumer Fed'n of America and Public Citizen v. U.S. Dep't of Health and Human Servs.*, 83 F.3d 1497, 1503 (D.C.Cir.1996) (quoting *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984)).

The Secretary's regulation permits the intermediary, in an overpayment situation, either to seek to recover the full extent of prior overpayments—threatening to suspend a provider's participation in Medicare if it does not pay—or to enter into an agreement with the provider (which is what occurred here) whereby the provider continues its services with appropriate deductions for the past overpayments. *See* 42 C.F.R. § 405.373(a)(2). To be sure, the latter alternative forms an executory contract, but it is not to be treated as would the post-petition performance of an ordinary executory contract under bankruptcy law; it is the *statute* which sets forth the extent of the government's obligation—the contract only implements the timing and pace of the payment of that obligation. If we were to conclude otherwise, the Secretary might be forced to insist on a provider's immediate repayment of the full amount once the intermediary determined the government overpaid—which could jeopardize the operation of the program. We do not think that comports with the statute, which sought to protect the taxpayer's interest yet provide the Secretary with the flexibility necessary to operate the program.

On the record before us, we cannot say what the "necessary" deduction is, for the parties have not included in the record documentation explaining exactly how much the intermediary was deducting from Consumer's periodic payments to account for the 1981–82 overpayments at the time Consumer petitioned for Chapter 11. On remand, the bankruptcy court will be able to calculate the amount Consumer "shall be paid," since the intermediary can clarify what it has determined "should be paid," and the parties can supplement the record to allow the court to determine what deductions are "necessary."

\* \* \* \* \* \*

The district court decision is reversed, and the case is remanded to the bankruptcy court for proceedings consistent with this opinion.

*So ordered.*

SENTELLE, Circuit Judge, concurring:

I concur with the majority's result and join in much of its reasoning. However, I would base the result solely on the majority's statutory rationale. That is, although I do not think the question free from doubt, I agree that the bankruptcy court in this case and the Third Circuit in *In re University Medical Center*, 973 F.2d 1065 (3rd Cir.1992), concluded without adequate authority that the bankruptcy code modifies the Medicare statute's explicit scheme for defining the government's liability to service providers. While any act of the bankruptcy court under the code is in a sense in breach of the source of law that gives rise to the obligation that the bankruptcy court reduces or extinguishes, this does not imply that the bankruptcy court is empowered by the code to depart from the statutory definition of the obligation in the first instance. To that extent, I think the bankruptcy court has overreached, and I concur in the reversal.

As I think the first rationale is sufficient, I do not join the majority in deciding the second question as to what constitutes a single "transaction." While I am not convinced that the majority is incorrect, neither am I convinced that it is necessary to create a precedent on that question which might arise in some other context. With that one reservation, I join the majority's opinion and result.