**In re SUN HEALTHCARE GROUP, INC., et al., Debtors.**

**Bankruptcy Nos. 99–3657 (MFW), 99–3841(MFW).**

United States Bankruptcy Court, D. Delaware.

Feb. 25, 2000.

Michael F. Walsh, Paul D. Leake, Peter Isakoff, Weil Gotshal & Manges, LLP, New York City, Mark D. Collins, Russell C. Silberglied, Richards Layton & Finger, Wilmington, DE, for Sun Healthcare Group, Inc., et al.

Glen Rice, Scott Hazan, Jenette Barrow–Bosshart, Otterbourg Steindler & Houston, New York City, Norman Pernick, Mark Minuti, Saul Ewing Remick & Saul LLP, Wilmington, DE, for Official Committee of Unsecured Creditors.

Charles A. Miller, Caroline M. Brown, Covington & Burling, Washington, DC, William A. Hazeltine, Potter Anderson & Corroon LLP, Wilmington, DE, for the States of Alabama, Connecticut, Idaho, Louisiana, Maryland, Missouri, New Hampshire, New Jersey, New Mexico, Oklahoma and Virginia.

David B. Stratton, Pepper Hamilton, LLP, Wilmington, DE, Ben H. Logan, O'Melveny & Myers, LLP, Los Angeles, CA, for Bank of America, N.A.

Stuart Hirshfield, Marc Hirshfield, Frederick Morris, Dewey Ballantine LLP, New York City, John J. Dawson, John A. Harris, Streich Lang, Phoenix, Arizona, Bonnie Glantz Fatell, Blank Rome Comisky & McCauley, Wilmington, DE, for The CIT Group/Business Credit, Inc. and Heller Healthcare Finance.

John D. McLaughlin, Maria D. Giannarakis, Daniel K. Astin, Office of the United States Trustee, Philadelphia, PA.

## OPINION[1]

MARY F. WALRATH, Bankruptcy Judge.

### I. INTRODUCTION

This matter is before the Court on the Motion of Twelve Medicaid Agencies[2] to

---

1. This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052, which is made applicable to contested matters by Federal Rule of Bankruptcy Procedure 9014.

2. The twelve movants are the medicaid agencies of the States of Alabama, Connecticut,

Vacate Order Prohibiting Certain Payors from Recouping Payments Owed to Debtors against any Prepetition Claims. The Motion is opposed by the Debtors and CIT Group Business Credit, Inc., and Heller Healthcare Finance, Inc. ("the DIP Lenders"). For the reasons set forth below, the Motion will be denied.

## II. *JURISDICTION*

This Court has jurisdiction over this matter, which is a core proceeding, pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(A), (D), (K), (M), and (O).

## III. *FACTUAL BACKGROUND*

On October 14, 1999, Sun Healthcare Group, Inc., and approximately 185 of its affiliates (collectively "the Debtors") filed voluntary petitions pursuant to chapter 11 of the Bankruptcy Code. At a hearing held on that day, a Motion was filed seeking entry of orders (in three stages) permitting the Debtors to borrow funds and use cash collateral pursuant to sections 363 and 364 of the Bankruptcy Code ("the DIP Financing Motion"). Actual notice of the relief sought on the first day by that Motion was provided to the United States Trustee's Office, the proposed DIP Lenders, Bank of America (the agent for the pre-petition secured lenders who had advanced approximately $900 million of the $1.1 billion in secured debt), and the attorney for the pre-petition unofficial committee of unsecured noteholders (which represent a substantial portion of the $1 billion in unsecured debt of the Debtors).

Since minimal notice was provided of that hearing, an Order was entered ("the First Day Order") pursuant to Rule 4001(b) and (c) of the Federal Rules of Bankruptcy Procedure only to the extent absolutely necessary to permit the Debtors to continue to operate to preserve their estates (thereby avoiding irreparable harm) until a hearing could be held on notice to all affected creditors. Testimony was proffered by the Debtors establishing the Debtors' inability to operate on cash collateral alone, their need for a credit facility, their negotiations with four prospective lenders, and their determination that the proposal offered by the DIP Lenders was adequate for the Debtors' needs and on the best terms available to them.[3] The First Day Order permitted borrowing of a maximum of $25 million, secured by a first lien on all unencumbered assets of the Debtors pursuant to section 364(c)(2)[4] and a lien on all other assets junior to any valid, perfected prepetition liens, pursuant to section 364(c)(3). The First Day Order also permitted the Debtors to use their cash collateral and granted to any party having a pre-petition lien in cash collateral replacement liens in post-petition collateral of the same type and priority, to the extent the use of cash collateral resulted in a diminution in the value of the pre-petition collateral. The pre-petition lenders, which asserted a first priority security interest in much of the Debtors' cash collateral, consented to the DIP Financing Motion.[5]

Idaho, Louisiana, Maryland, Missouri, New Hampshire, New Jersey, New Mexico, Oklahoma and Virginia (collectively, "the Movants").

3. In fact, based on the Debtors' projections, the Debtors anticipated a positive cash flow and no need to borrow before the interim hearing. However, because of the need to reassure the trade creditors who were providing terms and to have funds available in the event that the bankruptcy filing resulted in a constriction of cash flow, the Debtors sought a modest facility until an interim hearing could be held.

4. An affidavit of Matthew G. Patrick, the Vice President and Treasurer of Sun Healthcare Group, Inc., was submitted and stated that the accounts receivable of certain facilities owned by some of the Debtors were unencumbered. *See* Schedule 2.27 to Exhibit D of the Patrick Affidavit filed on October 14, 1999.

5. Their consent (to the use of their cash collateral and priming of their liens) was given in exchange for certain payments (to be authorized only after the interim hearing) as adequate protection of their $900 million in pre-petition secured debt, as follows: to Hel-

The DIP Financing Motion contemplated, however, that subsequent financing would only be given if the DIP Lenders were granted certain priming liens: on accounts receivable (except those secured by Omega Healthcare Investors), on inventory (except inventory at the skilled nursing facilities) and on leasehold interests (except that granted to Meditrust Mortgage Investors). Consequently, the First Day Order directed that notice of the DIP Financing Motion be given by hand delivery or overnight mail within one day of the entry of the Order to the following: all parties who were given notice of the First Day hearing, the twenty largest unsecured creditors, any party that had requested notices, and any party that may assert a lien which was to be primed, including mortgagees, industrial revenue bond trustees, all landlords, the United States Department of Justice, and all state Medicaid agencies. An interim hearing on the DIP Financing Motion was scheduled for October 22, 1999.

At the interim hearing, several objectors appeared, including the Internal Revenue Service, the United States Department of Health and Human Services ("HHS"), an industrial revenue bond trustee and Meditrust. The objections were largely resolved by revisions to the proposed interim order.[6] An Interim DIP Order was entered, which permitted the priming liens sought by the DIP Lenders and authorized borrowing up to $100 million until the final hearing. Actual and publication notice of the final hearing was given.[7]

A final hearing on the Debtors' financing was held on November 12, 1999. Once again, numerous objections were filed to the final relief sought in the DIP Financing Motion, many of which were resolved by clarifying language in the proposed order. With respect to the others, testimony and the arguments of counsel were heard, after which an Order dated November 12, 1999, was entered granting the DIP Financing Motion and authorizing the Debtors to obtain post-petition financing on a first secured and super-priority basis pursuant to sections 363, 364 and 507(b) to a maximum of $200,000,000. Pursuant to that Order, the DIP Lenders were granted, inter alia, priming liens on the Debtors' accounts receivable and proceeds thereof. An amended order was entered on November 29, 1999 ("the Final DIP Order"), to correct non-substantive errors in the Order (namely the paragraph numbering).

Subsequent to the entry of the Final DIP Order, the Movants filed (on December 3, 1999) their motion to vacate. The Debtors and the DIP Lenders filed an Objection to that motion and oral argument was heard on January 27, 2000.

The portions of the Final DIP Order which the Movants seek to vacate include paragraph 5 which provides that "pursuant to Bankruptcy Code §§ 105 and 362, any such holder [of a setoff claim on the accounts receivable of the Debtors] shall be stayed and prohibited from asserting any such offset or, except as set forth in paragraph 16 of this Order, recoupment rights against the Accounts." Paragraph 16 provides that (other than HHS, which had entered into a separate stipulation) "any governmental unit, including the departments and agencies thereof, shall have no right to recoup provider reimbursement overpayments that were made to any

---

ler $13.5 million and to Bank of America approximately $40 million.

6. With respect to the remaining objection of HHS, we found that it was adequately protected by its lien on the pre-petition accounts receivable of $145 million for the priming of its liens post-petition, at least for the interim period, during which the maximum DIP loans would be $100 million. After an appeal of the

Interim DIP Order, the Debtors and HHS ultimately resolved their dispute by written stipulation, approved by the Court at the final hearing.

7. It is conceded by the Movants that notice of the interim and final hearings was given to them. None of the Movants appeared at either hearing.

Debtor from any amounts due to such Debtor (or any other Debtor) other than to recoup such overpayments that arise under the same provider agreement or comparable applicable statutes, regulations, or arrangements, and in the same provider cost-year as the amounts due to such Debtor arise."

## IV. ARGUMENT

### A. Timeliness of the Motion

■ The Debtors and DIP Lenders argue as an initial matter that the Motion must be denied as untimely. They assert that the Motion seeks reconsideration of the November 12, 1999, Order pursuant to Rule 59 of the Federal Rules of Civil Procedure, incorporated by reference by Rule 9023 of the Federal Rules of Bankruptcy Procedure. Such a Motion must be filed within 10 days of the entry of the order.

The Movants assert to the contrary that their motion is timely since it is a Motion under Rule 60(b)(4) of the Federal Rules of Civil Procedure, incorporated by Rule 9024 of the Federal Rules of Bankruptcy Procedure. Rule 60(b)(4) provides that a party can seek relief, within a reasonable time, from entry of a judgment which is void. The Movants assert that the Order is void because this Court lacked jurisdiction over the Movants under the Eleventh Amendment.

■ We agree with the Movants that their Motion is timely since it asserts that the Court did not have jurisdiction to enter the Final DIP Order. Rule 60(b)(4) does provide relief from a judgment that is void due to lack of jurisdiction. *See, e.g., Echevarria–Gonzalez v. Gonzalez–Chapel,* 849 F.2d 24, 32 (1st Cir.1988) (lack of jurisdiction under Eleventh Amendment need not be raised at trial level to be considered by appellate court); *Bank of Montreal v. Olafsson,* 648 F.2d 1078, 1079 (6th Cir. 1981) (affirmed vacation of judgment under Rule 60(b)(6) as void for lack of subject matter jurisdiction even though bank had

relied upon it in foreclosing and selling property).

Alternatively, we find the Motion timely even under Rule 9023. The original Final DIP Order was dated November 12, 1999, but entered on the docket on November 18, 1999. Within ten days (on November 24, 1999), the Debtors filed a certification of counsel to correct clerical errors under Rule 9024 of the Federal Rules of Bankruptcy Procedure. The amended Final DIP Order was signed November 29, 1999, and entered on the docket on November 30, 1999. The Movants filed their motion to vacate within 3 days of entry of the amended Final DIP Order—on December 3, 1999. This was clearly a timely motion for reconsideration of the amended Final DIP Order under Rule 9023 or 9024.

### B. Lack of Jurisdiction to Enter Final DIP Order

■ The Movants assert that the Final DIP Order must be vacated as it affects them. They assert that the Court lacked jurisdiction to enter the Order because under the Eleventh Amendment the states and their agencies are immune from suit in a federal court.

The Eleventh Amendment to the United States Constitution states: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI.

The Supreme Court has held that Congress may not abrogate the sovereign immunity of the states, except under its Fourteenth Amendment powers. *See, e.g., Alden v. Maine,* 527 U.S. 706, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999); *College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board,* 527 U.S. 666, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999); *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). Consequently, the

Third Circuit has expressly held that Congress could not waive the states' sovereign immunity pursuant to section 106(a) of the Bankruptcy Code. *See, In re Sacred Heart Hospital of Norristown,* 133 F.3d 237 (3d Cir.1998). *See also, In re Fernandez,* 123 F.3d 241 (5th Cir.1997); *In re Creative Goldsmiths, Inc.,* 119 F.3d 1140 (4th Cir.1997).

### 1. *The DIP Financing Motion Was Not a Suit*

However, the *Sacred Heart* case (and the other cases cited by the Movants in their briefs) deal with a significantly different scenario from the one in this case. In those cases, a suit had actually been filed against the state. *See, e.g., Sacred Heart,* 133 F.3d at 239–40 (adversary complaint for money judgment); *Fernandez,* 123 F.3d at 242–43 (declaratory judgment action brought by secured creditors to determine that property was owned by debtor rather than state); *Creative Goldsmiths,* 119 F.3d at 1143 (adversary proceeding to recover preference from state). *See, also, Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (class action suit against state institution and officials); *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) (class action suit for injunctive and declaratory relief against state officials); *Ford Motor Co. v. Dept. of Treasury of Indiana,* 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945) (suit for money damages against state treasury); *Christy v. Pennsylvania Turnpike Commission,* 54 F.3d 1140 (3d Cir.1995) (suit under 42 U.S.C. §§ 1983 & 1985 against state agency); *In re DeAngelis,* 239 B.R. 426 (Bankr.D.Mass.1999) (adversary proceeding against state officials).

In fact, the Supreme Court has already held that section 106(c) of the Bankruptcy Code did not abrogate the Eleventh Amendment's protection of states from adversary proceedings under either section 542 or 547 of the Bankruptcy Code. *Hoffman v. Connecticut Dept. of Income Maintenance,* 492 U.S. 96, 104, 109 S.Ct. 2818, 106 L.Ed.2d 76 (1989).

In the instant case, in contrast, no adversary proceeding or other suit has been filed against the Movants. The only alleged "action" against the Movants in this case was the entry of the Final DIP Order in the ordinary course of this chapter 11 proceeding. The Fourth Circuit has held that similar actions are not suits falling within the purview of the Eleventh Amendment. *See, e.g., In re Collins,* 173 F.3d 924 (4th Cir.1999) (motion to reopen case to determine dischargeability of debt to state not a "suit"); *Maryland v. Antonelli Creditors' Liquidating Trust,* 123 F.3d 777 (4th Cir.1997) (order confirming plan which provided for waiver of state transfer tax not a "suit"). In *Antonelli,* the Fourth Circuit stated:

> The confirmation order in this case was not entered in a suit "against one of the United States" filed by a private party. The state was not named a defendant, nor was it served with process mandating that it appear in a federal court. While it was served with notice of the proposed plan and its confirmation, it was free to enter federal court voluntarily or to refrain from doing so. This is to be distinguished from the case in which a debtor, a trustee or other private person files an adversary action against the state in the bankruptcy court, causing the bankruptcy court to issue process summonsing the state to appear. Such an adversary proceeding would be a suit "prosecuted against one of the United States" and adjudication of that suit would depend on the court's jurisdiction over the state, implicating the Eleventh Amendment's limitation on federal judicial power.

123 F.3d at 786–87 (citations omitted). *See also, Texas v. Walker,* 142 F.3d 813, 822–23 (5th Cir.1998), *cert. denied,* 119 S.Ct. 865 (1999) (Eleventh Amendment did not prevent discharge of debt owed to state because bankruptcy case is not a "suit" under the Eleventh Amendment);

*In re Psychiatric Hospitals of Fla., Inc.,* 216 B.R. 660, 661 (M.D.Fla.1998) (affirmed bankruptcy court decision that motion pursuant to section 505 to determine debtor's tax liability to state was not a "suit" under the Eleventh Amendment); *In re International Heritage, Inc.,* 239 B.R. 306, 309–10 (Bankr.E.D.N.C.1999) (bankruptcy proceeding to determine scope of automatic stay, even if a contested matter, is not a "suit" under the Eleventh Amendment); *In re Barrett Refining Corp.,* 221 B.R. 795 (Bankr.W.D.Okla.1998) (confirmation of plan which discharged debt owed to the state was not a "suit" under the Eleventh Amendment).

Similarly, in this case there was no adversary complaint or other lawsuit filed against the Movants. Nor was any process or summons issued requiring the Movants to appear at the interim or final hearing on the DIP Financing Motion. They were free to appear or not.[8] However, the result of their failure to appear was that their rights were affected by the entry of the Order.

### 2. *The Final DIP Order Is Not a Money Judgment Against the States*

The Movants assert, however, that the Final DIP Order as it applies to them falls within the scope of actions prohibited by the Eleventh Amendment because it, like a suit against the states for a money judgment, results in the states paying money to the Debtors. The Order prevents the Movants from recouping funds that, in the absence of the bankruptcy filing, they assert they could keep as a result of previous overpayments made to the Debtors. Thus, they assert that the effect of the Order is that they will have to pay money to the Debtors that, in the absence of the Order, they would not have made. This is the essence, the Movants argue, of a suit.

We disagree with the Movants' argument on two bases. First, the Movants could not have kept the funds in the ab-

sence of the entry of the Order. The Order in question merely recites the effect of the Debtors' bankruptcy filing. It is the fact that the Debtors filed bankruptcy and the applicability of the Bankruptcy Code itself which results in the effects that the Movants seek to avoid, not the entry of the Order itself. For example, paragraph 5 merely recites that entities, including the states, are prohibited from taking certain actions as delineated in section 362(a) of the Bankruptcy Code. Specifically, section 362(a)(7) stays "the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor." 11 U.S.C. § 362(a)(7). Similarly, paragraph 16 merely reiterates the holding of the Third Circuit in *In re University Medical Center,* 973 F.2d 1065 (3d Cir.1992) that the equitable doctrine of recoupment is an exception to the effect of the automatic stay, but is only available if the claims arise under the same contract or transaction. *Id.* at 1079–80. In the *University Medical Center* case, the Third Circuit concluded that recoupment of Medicare overpayments could be accomplished, without violating the automatic stay, only if they related to the same cost year. *Id.* at 1081.

The Movants argue, however, that the holding in *University Medical Center* is not applicable to them since that case dealt with Medicare statutes which are different from the various state regulations at issue in their relationships with the Debtors. However, the relevant language of paragraph 16 is sufficiently broad to encompass this. It provides that recoupment is available only under the "same provider agreement or comparable applicable statutes, regulations, or arrangements, and in the same provider cost year." This is in keeping with the general holding of *University Medical Center* that recoupment is available only with respect to claims arising out of the same transaction or contract. *Id.* at

---

8. In fact, one state (the Texas Taxing Authorities) did appear at the final hearing on No-

vember 12, 1999, and its objection was heard and resolved.

1079–80. The Movants' citation to contrary authority from other courts is neither binding nor persuasive on this point. *See, e.g., United States v. Consumer Health Services of America, Inc.,* 108 F.3d 390 (D.C.Cir.1997) (rejecting reasoning in *University Medical Center* and holding that Medicare overpayments could be recouped in later cost year); *In re TLC Hospitals, Inc.,* 225 B.R. 709, 714–15 (N.D.Cal.1998) (declining to follow *University Medical Center* and allowing recoupment from Medicare provider beyond fiscal year); *Mercy Hospital of Watertown v. New York State Dep't of Social Services,* 171 B.R. 490 (N.D.N.Y.1994) (reversing bankruptcy court determination that recoupment was permitted and remanding for explicit findings that claims arose from the same transaction); *In re Tri County Home Health Services, Inc.,* 230 B.R. 106, 111 (Bankr.W.D.Tenn.1999) (although disagreeing with reasoning in *University Medical Center,* found recoupment requested would be allowed even under that reasoning since it was within the same fiscal year); *In re CDM Management Services, Inc.,* 226 B.R. 195, 197 (Bankr. S.D.Ind.1997) (finding that state provider agreement was a single continuing provider agreement in contrast to annual provider agreement in the *University Medical Center* case); *In re AHN Homecare, LLC,* 222 B.R. 804, 811–12 (Bankr.N.D.Tex.1998) (declining to follow *University Medical Center* and allowing recoupment of Medicare overpayments from prior cost years against current cost year); *In re Southern Institute for Treatment and Evaluation, Inc.,* 217 B.R. 962, 966 (Bankr.S.D.Fla.

1998) (following *Consumer Health* decision without mentioning *University Medical Center* case).[9]

Consequently, the Final DIP Order simply reiterates the requirements of the Bankruptcy Code, as interpreted in this Circuit. Thus, even in the absence of the entry of the Final DIP Order, the Movants would not have been free to act as they assert.

Second, the Final DIP Order is not an order directing the Movants to pay money to the Debtors. The Debtors admit that, if the Movants fail to obey that Order or to make payments otherwise due to the Debtors pursuant to the applicable provider agreements or Medicaid statutes, further action would be necessary. The Debtors concede that any such action would have to be consistent with the Eleventh Amendment.[10]

■ In contrast to a judgment to pay money, the Final DIP Order merely allows the Debtors to borrow money and pledge their property to secure those loans. The Final DIP Order is an order entered in the ordinary case in a chapter 11 proceeding under the Court's general, and exclusive, jurisdiction to administer property of the Debtors' estate. The fact that that Order may affect the rights of the states, and other parties, does not mean it is a suit against the states prohibited by the Eleventh Amendment.

In the *Texas v. Walker* case, the Fifth Circuit was presented with a similar argument to the Movants' in this case.[11]

---

9. Although it was not mentioned as a factor in reaching their ultimate decisions, we find it significant that in the *Consumer Health, TLC Hospitals* and *AHN Homecare* cases the debtors had ceased operating. *Consumer Health,* 108 F.3d at 393; *TLC Hospitals,* 225 B.R. at 710; *AHN Homecare,* 222 B.R. at 806. Thus, in those cases the courts did not have to deal with the potentially disastrous effects of allowing recoupment, *i.e.,* the loss of operating income and cessation of the debtor's business, leaving patients without crucial services.

10. *See, e.g., Ex Parte Young,* 209 U.S. 123, 155–56, 28 S.Ct. 441, 52 L.Ed. 714 (1908) (Eleventh Amendment does not bar suit against state official to enjoin action in violation of a federal statute).

11. In *Texas v. Walker,* the state was not even notified of the bankruptcy case. 142 F.3d at 815. In contrast, in this case the Movants acknowledge that they had actual notice of the DIP Financing Motion and the interim and final hearings.

The argument for an Eleventh Amendment bar would assert that although the State was not a named defendant in Walker's bankruptcy case, it was an indirect party because its legal rights were adjudicated and altered (albeit without its knowledge) when the bankruptcy court discharged Walker's debt. . . . This can be viewed as both subjecting the state to the indignity of the coercive powers of a federal court . . . and significantly altering the legal rights of the state. . . .

Put another way, discharging a debt owed to the state either restrains the state from acting by enjoining it from collecting the debt, or compels the state to act by forcing it to file a proof of claim in bankruptcy court in order to collect the debt. The state is thus presented with a Hobson's choice: either subject yourself to federal court jurisdiction or take nothing. . . . It can be argued that the Eleventh Amendment should prevent a state from being forced to make such a choice.

Resting as it does on extrapolations from Supreme Court cases, this argument is not specious, but it is ultimately unpersuasive on the facts before us. Its key assumption is the equation of a bankruptcy case with a suit against the state, but this assumption is flawed. In a bankruptcy case, in its simplest terms, a debtor turns over his assets, which constitute the estate, for liquidation by a trustee for the benefit of creditors according to their statutory priorities. Bankruptcy law modifies the state's collection rights with respect to its claims against the debtor, but it also affords the state an opportunity to share in the collection recovery. Bankruptcy operates by virtue of the Supremacy Clause and without forcing the state to submit to suit in federal court.

142 F.3d at 821–22.

The Fourth Circuit similarly concluded that a confirmation order which interpreted section 1146(c) to include a waiver of a state tax on the transfer of property from both the debtor to a liquidating trust and the liquidating trust to the end purchaser was not a suit against the state, although it affected the state's rights. *Antonelli*, 123 F.3d at 786. In so holding, the Court stated:

While resolution of an adversary proceeding against a state depends on court jurisdiction over that state, the power of the bankruptcy court to enter an order confirming a plan, including a provision interpreting § 1146(c), derives not from jurisdiction over the state or other creditors, but rather from jurisdiction over debtors and their estates.

It is true that if a state wishes to challenge a bankruptcy court order of which it receives notice, it will have to submit to federal jurisdiction. [*People of State of New York v. Irving Trust Co.*, 288 U.S. 329, 53 S.Ct. 389, 77 L.Ed. 815 . . . (1933).]

. . .

The state, of course, well may choose not to appear in federal court. But that choice carries with it the consequence of foregoing any challenge to the federal court's action. While forcing a state to make such a choice may not be ideal from the state's perspective, it does not amount to the exercise of federal judicial power to hale a state into federal court against its will and in violation of the Eleventh Amendment. Instead, it is the result of Congress' constitutionally authorized legislative power to make federal courts the exclusive venue for administering the bankruptcy law.

*Id.* at 787.

Like the *Antonelli* and *Walker* cases, this case involves an order entered, not in an adversary proceeding brought by the Debtors against the Movants, but in the main bankruptcy case. It was an Order which affected many parties' interests and direct property rights. Those parties appeared and their arguments were heard,

and in some instances, sustained. The Order dealt with the essence of bankruptcy law: the right of a debtor to use its property, including cash collateral, and the right of a debtor to pledge property to obtain credit. *See* 11 U.S.C. §§ 363 & 364.

The Movants do not argue that the Final DIP Order is not appropriate under sections 362, 363 and 364 of the Bankruptcy Code. Although the Order may affect the Movants' substantive rights, it is simply a consequence of this Court exercising the power granted by Congress to administer the property of the Debtors' estate. It is not a suit against the Movants individually and is not barred by the Eleventh Amendment.

### 3. *The Bankruptcy Code Applies to the States*

 The Movants have not argued that they are exempt from the effects of the Bankruptcy Code generally or from the effects of section 362(a)(7) specifically. Nor could they. The Constitution clearly states that federal law has supremacy.[12] This clearly includes bankruptcy law. *See, e.g., People of State of New York v. Irving Trust Co.*, 288 U.S. 329, 333, 53 S.Ct. 389, 77 L.Ed. 815 (1933) ("The federal government possesses supreme power in respect of bankruptcies"). *See also, New Jersey v. Mocco*, 206 B.R. 691, 692–93 (D.N.J.1997) (automatic stay precluded state from pursuing fraud action in state court); *In re Kidd*, 227 B.R. 161, 162 (Bankr.E.D.Ark. 1998) (state must respect and comply with Bankruptcy Code, including automatic stay).

As noted by the Court in *Kidd:*

> The Eleventh Amendment is not, however, a talisman providing state agencies with the authority or right to ignore federal law. The state and its agencies are bound by federal law, just as any

other creditor. The state must respect and comply with the Bankruptcy Code, including provisions regarding the automatic stay ... the discharge injunction ... and prohibitions against discriminatory treatment.

227 B.R. at 162.

The Final DIP Order which merely reiterates the constraints imposed on the Movants by section 362 of the Bankruptcy Code, as interpreted by the Third Circuit in *University Medical Center*, is binding on the states.

## V. CONCLUSION

For the foregoing reasons, the Motion to Vacate the Final DIP Financing Order will be denied.

---

12. Article 6, clause 2 of the Constitution provides:

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. Const. art. VI, cl. 2.